# IN THE SUPREME COURT, STATE OF WYOMING

## 2014 WY 13

OCTOBER TERM, A.D. 2013

January 27, 2014

ROBERT OLAF ANDERSON,

Appellant
(Defendant),

v.                                                     S-13-0019

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Albany County*
*The Honorable Jeffrey A. Donnell, Judge*

*Representing Appellant:*
Office of the State Public Defender: Diane M. Lozano, State Public Defender; Tina N. Olson, Chief Appellate Counsel; Kirk A. Morgan, Senior Assistant Appellate Counsel. Argument by Mr. Morgan.

*Representing Appellee:*
Peter K. Michael, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Jeffrey S. Pope, Assistant Attorney General. Argument by Mr. Pope.

*Before KITE, C.J., and VOIGT,\* BURKE, and DAVIS, JJ, and James, D.J.*

*\*Justice Voigt retired effective January 3, 2014.*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**VOIGT, Justice.**

[¶1]    A jury convicted the appellant of felony driving while under the influence of alcohol.  He now challenges two rulings of the district court—one concerning discovery and one concerning the admissibility of evidence—and also alleges his trial counsel was ineffective.  Finding no error, we affirm.

## ISSUES

[¶2]    1.    Did the district court abuse its discretion by denying in part the appellant's pretrial *Request for IntoxNet Database Pursuant to W.S. § 31-6-105(e) and Proof of Compliance with Statutory Predicate for Admission of a Chemical Test Result Under W.S. 31-6-105(a)*?

2.    Did plain error occur, in the form of a violation of the appellant's constitutional right to confrontation, when the State's expert witness testified as to the operation, maintenance, and accuracy of the breath alcohol test machine used in this case?

3.    Was the appellant's trial counsel ineffective in not calling an expert witness to testify as to the effect of diabetes on the results of a breath alcohol test?

## FACTS

[¶3]    The underlying facts of the traffic stop and arrest are not particularly material in this case.  Suffice it to say that, upon receiving a REDDI[1] report, a Laramie police officer investigated and eventually arrested the appellant for *per se* driving while under the influence of alcohol.[2]  During this process, the appellant "blew" blood alcohol content (BAC) tests that resulted in readings of 0.088% and 0.086%.

[¶4]    The State charged the appellant with one count of felony driving while under the influence of alcohol (DWUI) and the case proceeded towards trial.  During the discovery phase, the appellant requested a substantial amount of information from the State relating to the breathalyzer, an Intoximeter EC/IR II, used to test his breath.  The request included: (1) the appellant's breath test results; (2) the appellant's Operational Checklist for Intoximeter EC/IR I or II; (3) the most recent version of the Wyoming Intoximeter

---

[1] REDDI stands for "Report Every Drunk Driver Immediately."
[2] Wyo. Stat. Ann. § 31-5-233(b)(i) (LexisNexis 2013) reads in pertinent part:

> (b)   No person shall drive or have actual physical control of any vehicle within this state if the person:
> (i)    Has an alcohol concentration of eight one-hundredths of one percent (0.08%) or more[.]

EC/IR administrator manual; (4) the complete IntoxNet database in an electronic format for the Intoximeter EC/IR II used in the case (serial number 008087); (5) all monthly logs for the Intoximeter EC/IR II used in the case; (6) all maintenance records for the Intoximeter EC/IR II used in the case; and (7) all Litigation Support Packages that have ever been created for the Intoximeter EC/IR II used in the case. The State provided the appellant with three of these items: his breath test results, the Operational Checklist, and the administrator manual. It also provided the Litigation Support Package for the appellant's case, but none of the packages created in unrelated cases. The State objected to the remaining requests, asserting the appellant had a right only to the information directly related to his case.

[¶5]   Presented with this discovery dispute, the district court held a hearing, taking testimony from two potential expert witnesses concerning the subject breathalyzer's accuracy. The appellant presented Dr. Citron, an ophthalmologist, and the State presented Michael Moore, the head of Wyoming's chemical testing unit. Dr. Citron testified the general historical information from the IntoxNet database would allow him to decide if the machine was working properly; however, he admitted nothing in the information related to the appellant's test indicated it was rendering inaccurate results. The State's witness, Moore, also testified that his review of the data related to the appellant's tests did not suggest the machine was inaccurate and unreliable. Moore also explained that the required annual certification checks, monthly accuracy checks, and related safeguards ensured the machine's accuracy and reliability

[¶6]   Based upon the evidence presented at the hearing and analysis of controlling statutes and rules, the district court issued a clear and cogent order denying the appellant's discovery request, consistent with the State's objection. It explained:

> The statutory subsection [Wyo. Stat. Ann. § 31-6-105(e) (LexisNexis 2013)] relied upon by [the appellant] is clear and unambiguous on its face. It requires the defendant to receive information regarding *his* chemical test. It does not, however, authorize [the appellant] to receive information regarding any other test conducted by the Intoximeter EC/IR II used in this case. Stated simply, it does not support his request for the remaining items.

(Emphasis in original). The district court also found the quality procedures—annual certification, maintenance program, monthly accuracy checks—provided assurances that "nothing concerning [the appellant's] test warrants questioning the reliability of the Intoximeter EC/IR II used in this case in the manner desired by [the appellant]." Thus, it determined the IntoxNet data and other requests for general information concerning the breathalyzer were "not sufficiently material to the preparation of [the appellant's] defense to require discovery under Rule 16 [of the Wyoming Rules of Criminal Procedure]."

[¶7]   The case then proceeded to trial, during which the State established that the appellant had driven with a BAC above the legal limit.  Particularly, the jury was presented with the appellant's breath tests resulting in readings of 0.088% and 0.086%.  The State called Moore as an expert witness to explain the certification, maintenance, and calibration process for the Intoximeter EC/IR II.  Moore opined the machine used on the appellant was reliable, basing his opinion on a breadth of available information including its certification records.

[¶8]   The appellant did not present his own expert, Dr. Citron.  Instead, his strategy focused on attacking Moore's credibility.  The appellant attempted to show that, even though the machine previously had been certified as being accurate, it still had a propensity of being inaccurate and unreliable.  On cross-examination, Moore conceded the subject machine previously had been taken out of service to be repaired and had also registered "mouth alcohol abort" messages on several occasions.  But Moore was quick to clarify that a mouth abort message is not "an error in itself."  Rather, such a message "means that there's alcohol in the mouth from some sources and [the machine] detects it and aborts the test, so it will not do an analysis on that subject at that point in time."  Put another way, the machine would display such a message and shut down when it detected possible foreign substances that could taint the test.  Ultimately, Moore continued to conclude the machine was reliable.

[¶9]   The jury found the appellant guilty of felony driving while under the influence of alcohol, in violation of Wyo. Stat. Ann. § 31-5-233(b)(i) (LexisNexis 2013) (fourth or subsequent offense within ten years).  The district court imposed a sentence of twenty to twenty-four months incarceration, with credit for time served.  This appeal followed.

## DISCUSSION

### *Did the district court abuse its discretion by denying in part the appellant's pretrial Request for IntoxNet Database Pursuant to W.S. § 31-6-105(e) and Proof of Compliance with Statutory Predicate for Admission of a Chemical Test Result Under W.S. 31-6-105(a)?*

[¶10]  Before trial, the appellant filed a *Request for IntoxNet Database Pursuant to W.S. § 31-6-105(e) and Proof of Compliance with Statutory Predicate for Admission of a Chemical Test Result Under W.S. 31-6-105(a)*.  The request centered on receiving access to the "IntoxNet" database, which is maintained by the Wyoming Chemical Testing Program.  This database contains information on most, if not all, of the previous breath tests performed by Intoximeter EC/IR II machines, including the one used in this case.  The appellant asserted his broad request was proper because the accuracy of the machine used was questionable.  The State objected, a hearing was held, and after being fully informed, the district court denied the appellant access to the information in dispute.  The

appellant now argues the district court erred because the information was important to allow for a thorough cross-examination of the State's witnesses and to ascertain the accuracy of the machine.

[¶11]   The appellant attempts to style this issue as one involving a *Brady* violation. *See Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). Based on this characterization, he contends our review is *de novo*. We disagree. "To establish a *Brady* violation, a defendant must show that the prosecution suppressed evidence, the evidence was favorable to the defendant, and the evidence was material." *Kovach v. State*, 2013 WY 46, ¶ 20, 299 P.3d 97, 104 (Wyo. 2013) (citations and internal quotation marks omitted). There is no allegation the State suppressed any evidence, which is fundamental for a *Brady* violation. *See Downing v. State*, 2011 WY 113, ¶ 10, 259 P.3d 365, 368 (Wyo. 2011); *DeLoge v. State*, 2010 WY 60, ¶¶ 27-30, 231 P.3d 862, 868 (Wyo. 2010). The actual issue on appeal is one concerning the district court's ruling on a discovery matter. Discovery rulings are reviewed by this Court under the abuse of discretion standard. *Washington v. State*, 2011 WY 132, ¶ 11, 261 P.3d 717, 721 (Wyo. 2011); *Ceja v. State*, 2009 WY 71, ¶ 11, 208 P.3d 66, 68 (Wyo. 2009). Our primary concern is whether the district court's decision is reasonable. *Id.*; *Nelson v. State*, 2009 WY 37, ¶ 12, 202 P.3d 1072, 1075 (Wyo. 2009). The appellant, the party challenging the ruling here, has the burden to prove such an abuse. *Id.*; *Person v. State*, 2004 WY 149, ¶ 11, 100 P.3d 1270, 1275 (Wyo. 2004).

[¶12]   Criminal defendants do not have a general constitutional right to discovery. *Ceja*, 2009 WY 71, ¶ 13, 208 P.3d at 68; *Gale v. State*, 792 P.2d 570, 575 (Wyo. 1990) ("[a criminal defendant] does not have a general state or federal constitutional right to conduct wide-ranging criminal discovery in the state's files."). Rather, such discovery rights "must result from a statute, rule or trial court decision." *Hubbard v. State*, 618 P.2d 553, 554 (Wyo. 1980); *see also Kovach*, 2013 WY 46, ¶ 50, 299 P.3d at 112; *Ceja*, 2009 WY 71, ¶ 13, 208 P.3d at 68 ("Thus, while a defendant may request or demand certain information from the State, he is entitled to the information only insofar as required by statute, rule or case law."). The applicable statute and rule providing the appellant in this case with the right to certain discovery are Wyo. Stat. Ann. § 31-6-105(e) (LexisNexis 2013) and W.R.Cr.P. 16.

[¶13]   Wyoming's implied consent statute provides defendants with the ability to seek discovery related to the breath tests administered in their case. The pertinent statutory subsection provides that

> [u]pon the request of a person who undergoes a chemical test or tests as required by a peace officer, full information concerning the test or tests shall be made available to the person or his attorney.

4

Wyo. Stat. Ann. § 31-6-105(e). The appellant contends the phrase "full information" entitles him to all data regarding the subject machine. He asserts it includes access to the IntoxNet database, maintenance logs, and every litigation support package, regardless of whether it is generic information, related to another case, or directly related to his case. We conclude otherwise.

[¶14] Pursuant to our well-established rules for statutory interpretation,[3] we find Wyo. Stat. Ann. § 31-6-105(e) clear and unambiguous. The State only must provide information to the appellant related to his *own* chemical tests, nothing more. That is, "full information concerning the test or tests" taken by the appellant. To decide differently would require us to extend the provision to information that is not expressly required. *Redco Constr. v. Profile Properties, LLC*, 2012 WY 24, ¶ 26, 271 P.3d 408, 416 (Wyo. 2012) ("[W]e will not enlarge, stretch, expand, or extend a statute to matters that do not fall within its express provisions."). The State complied with § 31-6-105(e) when it provided the appellant with the results of his tests, the operational checklist used during his tests, the manual for using the subject machine in his case, and the certification records for the machine used.

[¶15] The appellant also attempts to expand the language of Wyo. Stat. Ann. § 31-6-105(e), by bootstrapping it to Wyo. Stat. Ann. § 31-6-105(a) (LexisNexis 2013). He argues the latter broadens the scope of discoverable information contemplated under the former. However, reading the provisions of Wyoming's implied consent statute *in pari materia*, we are not convinced the legislature intended such a result. *See DiFelici v. City of Lander*, 2013 WY 141, ¶ 13, 312 P.3d 816, 820 (Wyo. 2013) ("All statutes must be construed *in pari materia* . . . ."). Section 31-6-105(a) states:

> (a) Chemical analysis of the person's blood, breath or urine to be considered valid under this section, shall be performed according to methods approved by the department of health and by an individual possessing a valid permit to conduct the analysis. Permits shall be issued by the department of health for this purpose. The department of health may promulgate and approve satisfactory methods in order to ascertain the qualifications of individuals permitted to conduct the analysis and shall issue to qualified individuals permits which are subject to termination or revocation by the department of health.

---

[3] In interpreting statutes, our primary consideration is to determine the legislature's intent. *Cheyenne Newspapers, Inc. v. Building Code Bd. of Appeals of City of Cheyenne*, 2010 WY 2, ¶ 9, 222 P.3d 158, 162 (Wyo. 2010). We first inquire as to the ordinary and obvious meaning of the words employed according to their arrangement and connection, construing the statute in *pari materia*. *Id.* "When a statute is sufficiently clear and unambiguous, we give effect to the plain and ordinary meaning of the words and do not resort to the rules of statutory construction." *Id.* (citation and quotation omitted).

It is plain this provision sets forth quality control standards for all tests administered, but does not mention anything regarding discoverable information. The essence of *ejusdem generis* provides helpful guidance. Under this doctrine "general words, [associated with] an enumeration of words with specific meanings, should be construed to apply to the same general kind or class as those specifically listed." *DiFelici*, 2013 WY 141, ¶ 15, 312 P.3d at 821 (citations and quotations omitted). While the initial section, § 31-6-105(a), requires chemical tests adhere to approved methods, it does not even generally provide that certain information be discoverable. More importantly, it does not broaden what is specifically discoverable under § 31-6-105(e). What is statutorily discoverable pursuant to § 31-6-105 is found expressly and specifically in subsection (e).

[¶16] Because the State provided the appellant with all statutorily discoverable information, we now turn our attention to the rule concerning the same. Rule 16 of the Wyoming Rules of Criminal Procedure governs the extent of discovery in a criminal case, which states in pertinent part:

> (C) Documents and Tangible Objects. — Upon written demand of the defendant, the state shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the state, and which are material to the preparation of the defendant's defense or are intended for use by the state as evidence in chief at the trial, or were obtained from or belong to the defendant.

> (D) Reports of Examinations and Tests. — Upon written demand of a defendant, the state shall permit the defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession, custody, or control of the state, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the state, and which are material to the preparation of the defense or are intended for use by the state as evidence in chief at the trial.

W.R.Cr.P. 16(a)(1)(C)-(D).

[¶17] The appellant contends the complete IntoxNet database in an electronic format for the Intoximeter EC/IR II used to administer the appellant's tests, all monthly logs for the subject machine, and all maintenance records regarding the same, are material to the

preparation of his defense.[4]  "When considering the materiality of excluded evidence, we must determine whether 'there is a reasonable probability that the outcome of the case would have been different' had the evidence been admitted." *Washington*, 2011 WY 132, ¶ 18, 261 P.3d at 722 (citations and quotations omitted).  There are no such signs in the instant case.

[¶18]  The appellant argues that the only way to explore his concerns about the accuracy of the Intoximeter EC/IR II is to dig through all the data in the IntoxNet database and related generic information.  However, after reviewing the record, we agree with the district court's decision not to allow discovery of the requested generic information.  The State's expert, Moore, testified at the discovery hearing that his review of the data related to the appellant's tests did not indicate the machine was inaccurate or unreliable.  Moore explained that the required annual certification checks, monthly accuracy checks, and related safeguards ensured the machine's accuracy.  Even the appellant's proposed expert, Citron, testified the provided information relating to the appellant's test indicated it was rendering accurate results.  Indeed, if there was something wrong with the tests taken by the appellant, the information provided to him—test results, operational checklist, and litigation support package containing the maintenance and certification records—surely would have flagged the problem.  Nothing indicates the massive amounts of generic data requested by the appellant would be material and contribute to his defense.

[¶19]  The district court was reasonable in denying discovery of the complete IntoxNet database for the Intoximeter EC/IR II used to administer the appellant's tests, all monthly logs for the subject machine, and all maintenance records regarding the same, as that information is not material to the appellant's defense.  It exercised sound judicial discretion, which "is a composite of many things, among which are conclusions drawn from objective criteria . . . with regard to what is right under the circumstances without doing so arbitrarily or capriciously." *Washington*, 2011 WY 132, ¶ 22, 261 P.3d at 723 (citations and quotations omitted).

---

[4] The State does not rebut the appellant's argument that this information is within the possession of the prosecutor.  Accordingly, for purposes of this case, we assume the requested information was within the prosecutor's custody or control.

***Did plain error occur, in the form of a violation of the appellant's***
***constitutional right to confrontation, when the State's expert witness***
***testified as to the operation, maintenance, and accuracy of the***
***breath alcohol test machine used in this case?***

[¶20] We first address the applicable standard of review. The appellant contends he made a proper objection to the admission of evidence that violates his right to confrontation. As a result, he argues we must review the claim *de novo*. On the other hand, the State asserts no such objection was made, resulting in a review for plain error. We have reviewed the entire record and agree with the State that the appellant did not raise a confrontation clause violation below. The closest semblance of such an objection we found is as follows:

> Really quickly, Your Honor. Just a quick objection on the contents. We understand Mr. Moore is about to testify concerning the annual maintenance and specifically that one log that we have. It's our position [Moss Kent] should be the one testifying and not Mr. Moore. But just reserving that one.

This is at best an indistinct objection, providing no indication that it is one based upon a constitutional confrontation clause violation. Thus, even though the appellant claims constitutional error, without an appropriate objection, we will review his claim under a plain error standard. *See Bowlsby v. State*, 2013 WY 72, ¶ 6, 302 P.3d 913, 915-16 (Wyo. 2013); *see also Zumberge v. State*, 2010 WY 111, ¶ 4, 236 P.3d 1028, 1030 (Wyo. 2010); *Bush v. State*, 2008 WY 108, ¶ 29, 193 P.3d 203, 210 (Wyo. 2008).

> Even when constitutional error is alleged, each criterion must be satisfied or a claim for review under the plain-error doctrine will fail. To establish plain error, the appellant must prove (1) the record clearly reflects the alleged error; (2) the existence of a clear and unequivocal rule of law; (3) a clear and obvious transgression of that rule of law; and (4) the error adversely affected a substantial right resulting in material prejudice to him.

*Zumberge*, 2010 WY 111, ¶ 4, 236 P.3d at 1030 (quoting *Snow v. State*, 2009 WY 117, ¶ 13, 216 P.3d 505, 509 (Wyo. 2009)).[5]

[¶21] Turning to the merits, the appellant contends testimony of the State's expert, Moore, concerning the accuracy of the testing device violated his right to confrontation.

---

[5] We note the State concedes the first prong; that is, the testimony of Moore clearly appears in the record. Accordingly, we will limit our analysis to the remaining prongs.

Specifically, the appellant relies on a sliver of Moore's testimony concerning an annual certification of the machine's electronics and settings conducted by Moore's colleague, Moss Kent.[6] However, after solicitously examining United States Supreme Court precedent, we find Kent's annual certification for the Intoximteter EC/IR II is non-testimonial and not subject to the Confrontation Clause.

[¶22] Moore is the laboratory supervisor and senior forensic toxicologist for Wyoming's chemical testing program. The prosecution presented Moore as an expert to lay foundation for the reliability of the Intoximteter EC/IR II used on the appellant. Ultimately, Moore opined the subject machine was accurate and in compliance with Wyoming's requirements. In arriving at his opinion, he testified that he relied on a breadth of information, the majority of which was based upon personal knowledge. For instance, he testified working on the Intoximteter EC/IR II used on the appellant, assessed data the machine had captured, and reviewed more than 1,000 tests it performed. He also discussed the certification process of such machines from his own knowledge and experience in conducting those certifications.

[¶23] Moore also testified that, in accordance with Wyoming's rules and regulations, the Intoximteter EC/IR II machines must be certified on an annual basis. He explained that once a year the instrument is put through a series of tests to check the electronics and settings. A series of solutions are then used to test the ability of the instrument to measure alcohol accurately. If the instrument is producing accurate results and operating properly, it will be certified. Of note, Moore conducted the annual certification for 2010, the year immediately preceding the appellant's tests, which showed no signs of inaccuracies. This annual certification was included in the Litigation Support Package given to the appellant, which Moore testified about at trial.[7]

[¶24] Additionally, Moore testified about the subsequent 2011 annual certification that was also included in the Litigation Support Package. This annual certification was conducted as a matter of routine two months after the appellant's breath tests and certified by Kent, not Moore. Like every other annual certification, it encompasses a checklist with: results of an accuracy check, fuel cell diagnostics, blank samples, printer self test, print out of current pass codes, barometric pressure check, RFI check, and signature of the technician. We include this annual certification directly in our opinion for ease of reference:

---

[6] Kent is also a state forensic toxicologist, working in the same laboratory as Moore.

[7] A litigation support package consists of: the Intoximeter EC/IR II instrument characteristics, an annual certification check occurring before breath sample, an annual certification check occurring after breath sample, certificate of analysis for dry gas standards, maintenance log sheet, IntoxNet report for person tested, copy of permit of individual performing certification checks, and CV of expert witness.

WYO ING CHEMICAL TESTING PROGRAM
EC/IR II UNIT CERTIFICATION

LOCATION: Albany Co S.O.   SERIAL # 00 8087

| | YES | NO | N/A |
|---|---|---|---|
| 1. Instrument operational and location acceptable: | ✓ | | |
| 2. Perform Accuracy Check [F3] - 3 samples Expected Value: 0.078 Result 1: 0.077 Result 2 0.077, Result 3 0.077 Accuracy Check Passed (+5% / -10% of value and should agree within 0.008) | ✓ | | |
| 3. Obtain fuel cell diagnostics by pushing [shift] [F11]. | ✓ | | |
| 4. Run yourself as Blank [Enter] Results acceptable: | ✓ | | |
| 5. Run 0.10 Simulator as subject. [Enter] SIM #/Temp SD/210 /34.0°C Results acceptable (+5% / -10% of simulator value). Results obtained: 0.098  0.097 Lot # L0100B | ✓ | | |
| 6. Run 0.20 Simulator as subject. [Enter] SIM #/Temp: SD/311/34.0°P Results acceptable (+5% / -10% of simulator value). Results obtained: 0.192  0.190 Lot # L0101 B | ✓ | | |
| 7. Perform printer self test. (Place in local mode, then press and hold [PAPER ADVANCE] and [LINE/LOCAL] to start test. Stop test by pressing [PAPER ADVANCE]. | ✓ | | |
| 8. Print out list of current pass codes [Shift] [F7]. | ✓ | | |
| 9. Check the barometric pressure of the instrument versus the Tru-Cal in MM of Mercury. 588 / 591 | ✓ | | |
| 10. Run RFI check using portable transmitter. Hold antenna near display and keyboard (6") while running yourself, and transmitting. Required if there is a change of location. | ✓ | | |

NOTE: Use separate sheet to annotate deficiencies if necessary.

Signature: Moss Kent   Date: 6-22-11
Printed Name: Moss Kent   Title: Forensic Toxicologist

Instrument Approved for continued use in the State of Wyoming by:
Signature:
James Michae
WCTP Supervisor Co    ator   Date: 7/6/2011

091

[¶25] The extent of Moore's testimony concerning the 2011 annual certification performed by Kent is as follows:

> Q. Now, is there a date that this machine or the Albany County Sheriff's machine was certified?
> A. This particular certification was done on June 22 of 2011.
> Q. And who did the certification?
> A. This actual certification was done by Moss Kent.
> Q. And who is he?
> A. Moss Kent is one of the forensic toxicologists that works in my lab.
> Q. And I would like to turn your attention to pages 6 through, I believe it's 16. What are we looking at with these?
> A. Pages 6 through 16 are the actual printouts from the instrument as we're doing the certification. It's what the instrument prints out when we finish a test.
> Q. And have you had a chance to review this?
> A. Yes, I did.
> Q. And based on your review, do you see any errors in these printouts?
> A. No, I do not.

10

The prosecutor did not introduce Kent's annual certification into evidence and it was not used to prove the truth of any matter asserted. It is this limited foundational testimony of Moore's, concerning the annual certification signed by Kent, with which the appellant takes issue.

[¶26] Knowing the narrow circumstance concerning the appellant's confrontation claim, we turn to the controlling law of the land. Regarding the second prong of our plain error analysis, a constitutional right to confront a witness arises under the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Wyoming Constitution. *Kramer v. State*, 2012 WY 69, ¶ 19, 277 P.3d 88, 93 (Wyo. 2012), *cert. denied*, 133 S.Ct. 483 (2012). The central right protected by the Confrontation Clause of the United States and Wyoming Constitutions is the right of cross-examination. *Downing*, 2011 WY 113, ¶ 11, 259 P.3d at 368. However, the admission of out-of-court statements does not violate the Confrontation Clause if they are not testimonial. *See Bush*, 2008 WY 108, ¶ 39, 193 P.3d at 213.

[¶27] In *Crawford v. Washington*, the United States Supreme Court held that the Sixth Amendment's Confrontation Clause requires a trial court to exclude hearsay that is testimonial in nature unless the declarant is unavailable and the defendant has had an earlier opportunity to cross-examine the witness. 541 U.S. 36, 68, 124 S.Ct. 1354, 1374, 158 L.Ed.2d 177 (2004). Central to the issue in the instant case, *Crawford* provided instruction on the criterion in determining whether an out-of-court statement is "testimonial":

> Testimony, in turn, is typically [a] solemn declaration or affirmation made for the purpose of establishing or proving some fact. An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement.
>
> Various formulations of this core class of testimonial statements exist: *ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially[;] extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"[;] statements that were made

11

under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial. These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition— for example, *ex parte* testimony at a preliminary hearing.

*Crawford*, 541 U.S. at 51-52, 124 S.Ct. at 1364 (citations and quotations omitted). Although providing general guidance on what statements are considered testimonial for purposes of the Confrontation Clause, the Supreme Court chose to "leave for another day any effort to spell out a comprehensive definition of 'testimonial.'" *Id.* at 68, 124 S.Ct. at 1374.

[¶28] Since *Crawford*, the nation's highest court has produced a "steady stream" of cases concerning this difficult issue. *Williams v. Illinois*, --- U.S. ---, 132 S.Ct. 2221, 2232, 183 L.Ed.2d 89 (2012); *Bullcoming v. New Mexico*, --- U.S. ---, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011); *Michigan v. Bryant*, --- U.S. ---, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011); *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009); *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). Three of these decisions have dealt with scientific reports and experts, which guide us to our conclusion today.

[¶29] In *Melendez–Diaz*, the Supreme Court declined to create an exception to *Crawford* for a forensic laboratory report that was specifically created to be evidence in the criminal proceeding. 557 U.S. at 309, 129 S.Ct. at 2531. At issue was the admission into evidence of laboratory certificates of analysis detailing the results of a forensic analysis conducted on the alleged drugs seized. *Id.* There, the defendant was charged with distributing and trafficking and the prosecution introduced what was determined to be cocaine. To prove the substance was cocaine, the prosecution introduced, and trial court admitted into evidence, three certificates of analysis from the state forensic laboratory stating the substance had been "examined with the following results: The substance was found to contain: Cocaine." *Id*. at 308, 129 S.Ct. at 2531 (citations and quotations omitted).

[¶30] When the case finally arrived before the Supreme Court, it held these certificates were testimonial and their admission into evidence ran afoul of the Sixth Amendment. The certificates were executed under oath before a notary and were created for "the sole purpose of providing evidence against a defendant." *Id*. at 323, 129 S.Ct. at 2539. Accordingly, it did not hesitate to characterize the certificates as affidavits and stressed that their introduction to prove the nature of the substance equated to "live, in-court testimony" on that critical fact and that the certificates did "precisely what a witness does on direct examination." *Id*. at 311, 129 S.Ct. 2532. Succinctly put by the Supreme

12

Court, the "*sole purpose* of the affidavits [under applicable state law] was to provide prima facie evidence of the composition, quality, and the net weight of the analyzed substance." *Id.* (citations and internal quotation marks omitted). Thus, the Supreme Court concluded that under *Crawford*, the analyst's affidavit-esque certificates "were testimonial statements, and the analysts were 'witnesses' for purposes of the Sixth Amendment." *Id.* at 311, 129 S.Ct. at 2532. The court made clear, however, that

> we do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or *accuracy of the testing device*, must appear in person as part of the prosecution's case. . . . . *Additionally, documents prepared in the regular course of equipment maintenance may well qualify as nontestimonial records*.

*Id.* at 311 n.1, 129 S.Ct. at 2532 n.1 (emphasis added).

[¶31]  In *Bullcoming v. New Mexico*, the court reaffirmed that forensic reports "created specifically to serve as evidence in a criminal proceeding" are testimonial. 131 S.Ct. at 2709. It again held that such a report could not be used substantively unless the analyst who prepared and certified the report was subject to confrontation. There, the defendant rear-ended another vehicle and left the scene before the police arrived. *Id.* at 2710. Soon thereafter he was apprehended by a police officer, failed the field sobriety tests and refused to take a breath test. *Id.* The defendant was arrested for driving a vehicle under the influence of alcohol and a warrant was obtained to perform a BAC blood test. A sample of the defendant's blood was drawn and sent to the New Mexico Department of Health, Scientific Laboratory Division (SLD), for testing. *Id.* An SLD forensic analyst tested the defendant's blood, recorded the results of the test, and certified that he had followed all procedures listed on the BAC report.[8] *Id.*

[¶32]  At trial, the central piece of evidence used to convict the defendant of aggravated DWI was the forensic report certifying the defendant's BAC. However, the prosecution did not call the analyst who signed and certified the report; rather, it called another analyst who "was familiar with the laboratory's testing procedures, but had neither participated in nor observed the test on [the defendant's] blood sample."[9] *Id.* at 2709. Over the defendant's objection that the introduction of the BAC report without the certifying analyst's testimony would violate his confrontation right, the trial court admitted the report under the business records hearsay exception and permitted the other analyst to testify. *Id.* at 2710.

---

[8] The appellant's BAC was 0.21, well over New Mexico's threshold of 0.16 for aggravated DWI.
[9] The State did not contend the certifying analyst was unavailable.

[¶33] Upon review by the United States Supreme Court, it held "that surrogate testimony of that order does not meet the constitutional requirement[,]" and "[t]he accused's right is to be confronted with the analyst who made the certification . . . ." *Id.* at 2710. It explained:

> In all material respects, the laboratory report in this case resembles those in *Melendez–Diaz*. Here, as in *Melendez–Diaz*, a law-enforcement officer provided seized evidence to a state laboratory required by law to assist in police investigations. Like the analysts in *Melendez–Diaz*, [the analyst] tested the evidence and prepared a certificate concerning the result of his analysis. Like the *Melendez–Diaz* certificate, [the certificate at issue] is "formalized" in a signed document . . . .
>
> In sum, the formalities attending the "report of blood alcohol analysis" are more than adequate to qualify [the analyst's] assertions as testimonial.

*Id.* at 2717 (citations omitted).

[¶34] Most recently, in *Williams v. Illinois*, the Supreme Court again revisited the Confrontation Clause, this time to determine the "constitutionality of allowing an expert witness to discuss others' testimonial statements if those statements are not themselves admitted as evidence." 132 S.Ct. at 2223. A plurality opinion by Justice Alito, joined by Chief Justice Roberts, Justice Kennedy, and Justice Breyer, determined the defendant's confrontation clause rights were *not* violated when the State's DNA expert testified, in a bench trial, to an opinion based on a report prepared by a non-testifying analyst.[10] *Id.* Its reasoning was twofold.

[¶35] First, the court found the report fell outside of the scope of the Confrontation Clause because it was not used for the truth of the matter asserted. The court highlighted that "[i]t has long been accepted that an expert witness may voice an opinion based on facts concerning the events at issue in a particular case even if the expert lacks first-hand knowledge of those facts." *Id.* at 2233. Under the applicable state and federal evidentiary rules, "an expert may base an opinion on facts that are 'made known to the expert at or before the hearing,'" even if those facts themselves are inadmissible. *Id.* at 2234 (citation omitted). The court held "it is clear that the putatively offending

---

[10] The defendant had argued the State's expert "went astray when she referred to the DNA profile provided by [a third party company] as having been produced from semen found on the victim's vaginal swabs," *Id.* at 2227, even though she did not conduct or observe any of the work [the third party company] had done in deducing a male DNA profile. *Id.* at 2230.

phrase . . . was not admissible for the purpose of proving the truth of the matter asserted," and "[t]here is no reason to think that the trier of fact [*i.e.*, the judge] took [such testimony] as substantive evidence to establish where the DNA profiles came from." *Id*. at 2236. It concluded that there had been no confrontation clause violation because additional evidence also established the origin of the DNA profile, and the trial court presumably did not consider the evidence for its truth. *Id*. at 2240. Contrasting *Bullcoming* and *Melendez–Diaz*, where there was no question that the test results were offered for their truth, the court found the report was offered "only for the distinctive and limited purpose of seeing whether it matched something else." *Id*. at 2240 (citation and internal quotation marks omitted).

[¶36] Second, the court held no confrontation clause violation occurred because the report was non-testimonial. It explained that "[t]he abuses that the Court has identified as prompting the adoption of the Confrontation Clause shared the following two characteristics: (a) they involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions." *Id*. at 2242. Accordingly, the court found the third party laboratory's report was

> very different from the sort of extrajudicial statements, such as affidavits, depositions, prior testimony, and confessions, that the Confrontation Clause was originally understood to reach. The report was produced before any suspect was identified. The report was sought not for the purpose of obtaining evidence to be used against petitioner, who was not even under suspicion at the time, but for the purpose of finding a rapist who was on the loose.

*Id*. at 2228. Thus, the report did not violate the Confrontation Clause, because its purposes were not of the same type that the clause was designed to protect against. *Id*. Justice Thomas concurred solely in the judgment and did not concur with the test used by the plurality. *Id*. at 2255 (Thomas, J., concurring). Rather, he determined the report was non-testimonial because it "lack[ed] the solemnity of an affidavit" and "was not the product of any sort of formalized dialogue resembling custodial interrogation." *Id*. at 2260.

[¶37] We acknowledge there was no single basis in *Williams* garnering the support of a majority of the Justices. As a result, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as the position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977) (citation and internal quotation marks omitted). The narrowest ground for the court's disposition in *Williams* is that of the lead opinion

and Justice Thomas: the subject report was not testimonial. But, as the Arizona Supreme Court recently explained, "[n]either the plurality's 'primary purpose' test nor Justice Thomas's solemnity standard can be deemed a subset of the other; therefore, there is no binding rule for determining when reports are testimonial." *State v. Medina*, 306 P.3d 48, 63 (Ariz. 2013) (citing *United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 189 (2d Cir. 2003) (holding that when no "single standard . . . legitimately constitutes the narrowest ground for a decision on that issue, there is then no law of the land")). We agree, and apply *Williams* accordingly.

[¶38] Acquainted with the law of the land, we now turn to the third prong of the test for plain error. Based upon the United States Supreme Court's precedent concerning the Confrontation Clause, we find the testimony of the State's expert, Moore, concerning the annual certification prepared and signed by Kent, is not a clear and obvious transgression of controlling law. We arrive at this conclusion based solely on whether the annual certification is testimonial.[11] Regardless of which of the narrowest rationales is applied, the plurality's or Justice Thomas', the result is the same: the annual certification at issue in the instant case is not testimonial.

[¶39] The primary purpose of Kent's annual certification of the Intoximteter EC/IR II's functionality and accuracy simply is to comply with the legislative certification requirements for quality assurance of all chemical tests:

> (a) Chemical analysis of the person's blood, breath or urine to be considered valid under this section, shall be performed according to methods approved by the department of health and by an individual possessing a valid permit to conduct the analysis. Permits shall be issued by the department of health for this purpose. The department of health may promulgate and approve satisfactory methods in order to ascertain the qualifications of individuals permitted to conduct the analysis and shall issue to qualified individuals permits which are subject to termination or revocation by the department of health.

Wyo. Stat. Ann. § 31-6-105(a) (LexisNexis 2013). The annual certification is wholly different from the kind of extrajudicial statements the Confrontation Clause was understood to encompass.

---

[11] The State argues Moore's expert testimony concerning the annual certification signed by Kent complies with the plurality of *Williams'* first ground—that the laboratory report there was offered as basis evidence, and not for its truth. We need not address this argument, however, because the annual certification at issue here is not testimonial.

16

[¶40] The annual certification was not created because of the appellant's case. Kent would have prepared the annual certification even if the appellant had decided not to drink and drive on that fateful day. Indeed, the annual certification was prepared several months after the appellant's tests were administered.[12] An annual certification is to comply with Wyoming's rules and regulations, which require the Department of Health to certify the accuracy of breathalyzer machines, regardless of whether law enforcement utilizes them or whether they become an issue in a case. Such compliance certifications are part of a quality assurance program, not for accusing a targeted individual of engaging in criminal conduct. In accordance with the *Williams'* plurality, the primary purpose of the annual certification, viewed objectively, is not to accuse a specified individual—the appellant. *See Williams*, 132 S.Ct. at 2243 ("We look for the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances."). Furthermore, annual certifications regarding the accuracy of breathalyzer machines lack the requisite formality and solemnity to be considered testimonial for purposes of the Confrontation Clause.[13] *See id.* at 2255 (Thomas, J., concurring).

[¶41] Additionally, we note that unlike *Melendez–Diaz* and *Bullcoming*, where the Supreme Court concluded the results of the tests were testimonial because they were completed "for the purpose of establishing or proving some fact at trial," *Melendez–Diaz*, 557 U.S. at 324, 129 S.Ct. at 2540, or were "affirmation[s] made for the purpose of establishing or proving some fact in a criminal proceeding," *Bullcoming,* 131 S.Ct. at 2716 (citation and internal quotation marks omitted), in the instant case Kent's annual certification cannot prove an element of, or serve as prima facie evidence of, any crime in Wyoming. It only is relevant to the routine maintenance performed to check the general accuracy of the testing device. *See Melendez*, 557 U.S. at 311 n.1, 129 S.Ct. at 2532 n.1 ("[W]e do not hold . . . that anyone whose testimony may be relevant in establishing the . . . accuracy of the testing device, must appear in person as part of the prosecution's case. . . . Additionally, documents prepared in the regular course of equipment maintenance may well qualify as nontestimonial records.").

[¶42] In sum, we find the annual certification prepared by Kent is not testimonial for purposes of the Confrontation Clause. Therefore no error, much less plain error, occurred in allowing Moore to briefly testify about it, even though Moore did not conduct that annual certification himself.

---

[12] The previous annual certification was also included in the Litigation Support Package, which was prepared by Moore the year before.

[13] Justice Thomas determined the report in *Williams* not testimonial as it was "neither a sworn nor a certified declaration of fact" and "it was not the product of any sort of formalized dialogue resembling custodial interrogation." *Williams*, 132 S.Ct. at 2260 (Thomas, J., concurring). Similarly, here, the annual certification details the annual accuracy checks conducted on the machine and is simply signed by the person conducting the accuracy check.

*Was the appellant's trial counsel ineffective in not calling*
*an expert witness to testify as to the effect of diabetes*
*on the results of a breath alcohol test?*

[¶43]   The appellant argues his trial counsel was ineffective by failing to call an expert to explain the effect the appellant's diabetes could have on the results of his BAC breath tests.  He contends that his diabetes provides "a valid legal defense that his blood alcohol level was not actually above the statutorily prohibited level, but appeared at an elevated amount as the Intoximeter registered an inaccurate reading due to [his] medical condition."

[¶44]   The two-part test to determine counsel's effectiveness is well established.  We recently explained:

> To prevail on a claim of ineffective assistance of counsel, a defendant must first establish that trial counsel's performance was deficient.  This requires a showing that counsel failed to render such assistance as would have been offered by a reasonably competent attorney.  Assuming a sufficient showing that counsel performed deficiently, a defendant must also prove the deficient performance prejudiced the defense.  That is, a defendant must show a reasonable probability exists that, but for counsel's deficient performance, the outcome would have been different.  In order to prevail on an ineffectiveness claim, a defendant must prove both deficient performance and prejudice.  The failure to make the required showing of either deficient performance or prejudice will result in a finding that counsel was not ineffective.

> Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  When an ineffective assistance claim is based upon the failure to call an expert witness, the defendant must show an expert was available who would have testified consistently with his theory.  However, upon making a showing that counsel did not reasonably investigate or unreasonably failed to call an expert witness, a defendant still must show that the deficient performance prejudiced him.

*Osborne v. State*, 2012 WY 123, ¶¶ 19-20, 285 P.3d 248, 252 (Wyo. 2012) (citations omitted).   We have also referenced the following standard in examining counsel's performance:

Standard 4-5.2 Control and Direction of the Case

(a) Certain decisions relating to the conduct of the case are ultimately for the accused and others are ultimately for defense counsel. The decisions which are to be made by the accused after full consultation with counsel include:

(i) what pleas to enter;

(ii) whether to accept a plea agreement;

(iii) whether to waive jury trial;

(iv) whether to testify in his or her own behalf; and

(v) whether to appeal.

(b) Strategic and tactical decisions should be made by defense counsel after consultation with the client where feasible and appropriate. Such decisions include what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike, what trial motions should be made, and what evidence should be introduced.

(c) If a disagreement on significant matters of tactics or strategy arises between defense counsel and the client, defense counsel should make a record of the circumstances, counsel's advice and reasons, and the conclusion reached. The record should be made in a manner which protects the confidentiality of the lawyer-client relationship.

ABA Standards for Criminal Justice, *Prosecution Function and Defense Function* (3rd ed. 1993).

*Grainey v. State*, 997 P.2d 1035, 1040-41 (Wyo. 2000).

19

[¶45] Here, the record indicates that trial counsel conducted an investigation into this matter, given the identification in a pretrial pleading of the appellant's potential expert witness, Citron. Citron was noticed to testify on several topics, including the following:

> Dr. Citron is expected to testify that the limited discovery provided by the State concerning [the appellant's] breath test result to date is not sufficient to determine to reasonable degree of scientific certainty if the machine is working properly. However, based on such factors as the 0.020 margin of tolerance/error allowed for [the appellant's] two (2) breath samples under the Wyoming Department of Health's rules and regulations, as well as [the appellant's] inherent physical attributes such as body temperature, partition ration as expressed by the State created definition of alcohol concentration for breath of 2100:1; and, [the appellant's] diabetic condition: it is more probable than not that [the appellant's] breath test result is not accurate and valid and can be off as much as .07%.

At first blush it might appear the appellant's diabetes could have provided a viable defense, but a closer review supports trial counsel's strategy not to call Citron.

[¶46] The appellant contends the ketones in his body could possibly have caused falsely high blood-alcohol readings. However, the facts belie his claim. The appellant has type 2 diabetes. This type of diabetes is not usually associated with ketoacidosis. *See* A.D.A.M. Medical Encyclopedia, *Type 2 Diabetes*, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0010129/ (last visited January 16, 2014). Rather, ketoacidosis usually comes about in people with type 1 diabetes, who are insulin dependent. *Id.* Ketoacidosis occurs when ketones, a form of acid, build up in one's body due to insufficient insulin. *See* A.D.A.M. Medical Encyclopedia, *Diabetic Ketoacidosis*, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001363 (last visited January 16, 2014). If ketoacidosis develops, the diabetic person may experience a myriad of symptoms including dry-mouth or fruity breath odor, and keytones on the breath could theoretically register as ethyl alcohol on BAC breath tests. Brick, *Diabetes, Breath Acetone and Breathalyzer Accuracy: A Case Study*, 9(1) Alcohol, Drugs and Driving (1993). In *Michaels v. State ex rel. Dep't of Transp.*, the defendant, a type 1 diabetic, claimed his blood-alcohol levels may have been affected by ketoacidosis. 2012 WY 33, ¶ 8, 271 P.3d 1003, 1006 (Wyo. 2012). There, we also noted the attributes of ketoacidosis:

[¶47] Diabetic ketoacidosis is described as follows:

> People with type 1 diabetes do not have enough insulin, a hormone the body uses to break down sugar (glucose) in the blood for energy. When glucose is not available, fat is broken down instead.
>
> As fats are broken down, acids called ketones build up in the blood and urine. In high levels, ketones are poisonous. This condition is known as ketoacidosis.
>
> Blood glucose levels rise (usually higher than 300 mg/dL) because the liver makes glucose to try to combat the problem. However the cells cannot pull in that glucose without insulin. Diabetic ketoacidosis is often the first sign of type 1 diabetes in people who do not yet have other symptoms. It can also occur in someone who has already been diagnosed with type 1 diabetes. Infection, injury, a serious illness, or surgery can lead to diabetic ketoacidosis in people with type 1 diabetes. Missing doses of insulin can also lead to ketoacidosis in people with diabetes.
>
> Symptoms can include: deep, rapid breathing, dry skin and mouth, flushed face, fruity smelling breath, decreased consciousness, and dulled senses.
>
> http://medlineplus.gov.

*Id.* at 271 P.3d at 1006, ¶ 8 n.2. In the instant case, the type 2 diabetic appellant did not experience any of these symptoms.

[¶48] We have undertaken a thorough review of the appellant's brief, the record, and the applicable law. Regardless of the appellant's post hoc argument on appeal, trial counsel is required to be careful and competent, but not prescient. Based upon the dearth of predicate facts required to mount such a diabetic defense, his trial counsel's tactic not to call Citron did not fall below objectively reasonable standards of attorney performance considering the circumstances of this case and the extant law. *See Lopez v. State*, 2004 WY 28, ¶¶ 27-35, 86 P.3d 851, 860-61 (Wyo. 2004).

## CONCLUSION

[¶49] Finding no error, we affirm the appellant's conviction for felony driving while under the influence of alcohol.