# IN THE SUPREME COURT, STATE OF WYOMING

## 2016 WY 107

OCTOBER TERM, A.D. 2016

November 14, 2016

RYAN ALEXANDER BROWN,

Appellant
(Defendant),

v.

S-15-0264

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Albany County*
*The Honorable Jeffrey A. Donnell, Judge*

*Representing Appellant:*

Office of the State Public Defender: Diane Lozano, State Public Defender; and Tina N. Olson, Chief Appellate Counsel. Argument by Ms. Olson.

*Representing Appellee:*

Peter K. Michael, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Christyne Martens, Senior Assistant Attorney General; and James Michael Causey, Senior Assistant Attorney General. Argument by Mr. Causey.

*Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**HILL,** Justice.

[¶1]    After being found guilty of conspiracy to commit first-degree murder, Ryan Alexander Brown claims the trial court committed errors when it allowed the State to introduce evidence in the form of a demonstrative video, a bank statement, and W.R.E. 404(b) evidence.  We will affirm.

## ISSUES

[¶2]    Mr. Brown presents three issues for our review:

1. [Brown] was denied due process when the trial court allowed the state to play a video of an explosion of a "pipe bomb" when that video was not timely provided to defense counsel and was irrelevant.

2. [Brown] was denied due process when the trial court allowed the state to use evidence, a bank statement, which the state did not timely provide to defense counsel.

3. The trial court erred in admitting character evidence under W.R.E. 404(b) and in refusing to give a limiting instruction with regard to use of W.R.E. 404(b) evidence.

.

## FACTS

[¶3]    Ryan Brown and his wife Angela owned a home in Arlington, Wyoming.  They spent time together there on the weekends, but because Angela was a dispatcher for the Laramie Police Department, she and her daughter spent most of the week in Laramie at another house.  In the summer of 2013, due in part to their time apart, Brown began to suspect that his wife was having an affair with a man named John Squires from Cheyenne.  Mr. Brown confided his suspicion to Eric Farrar and William Ferrill, new acquaintances to Mr. Brown.

[¶4]    The confidantes' conversations began to develop in 2013 as summer turned to fall to the point that Mr. Brown asked Mr. Farrar to help him harm Mr. Squires.  This continued into 2014.  Mr. Brown initially offered to pay Mr. Farrar for his help in killing Mr. Squires, but then he changed his mind and simply offered Mr. Farrar money if he killed Mr. Squires on his own.  In the initial plans to kill Mr. Squires, the men imagined using a firearm, faking a suicide, or drowning Mr. Squires in a pond, but in May of 2014, Mr. Brown decided to build a bomb that instead would kill Mr. Squires.  Mr. Brown purchased an alarm clock and began tinkering with it in order to make a timer for a bomb.

1

He also began work on a motion sensor but abandoned the entire bomb plan because he feared he would hurt himself in the process.

[¶5] On May 23, 2014, the plan further evolved. Mr. Brown offered Mr. Farrar $10,000.00 to help both burn down Mr. Brown's house in Arlington and kill Mr. Squires. Mr. Farrar agreed to this plan. As per Mr. Brown's request, Mr. Farrar removed Mr. Brown's firearms from his Arlington house and proceeded to set the house on fire. In August of 2014, Mr. Brown paid Mr. Farrar $5,000.00 from the insurance proceeds he collected from the fire. Mr. Farrar deposited half of that amount and used the remainder to repair his truck.

[¶6] That fall, Mr. Brown decided to continue with the pipe bomb plan to kill Mr. Squires, and asked Mr. Farrar, and their mutual friend Mr. Ferrill, for their assistance. Mr. Brown intended to place the bomb in Mr. Squires' truck and to connect a spark plug in the bomb to the wiring of the truck so that when Mr. Squires started his truck, the spark plug in the bomb would ignite the gunpowder. Mr. Brown and Mr. Ferrill met one evening, and Mr. Ferrill brought gunpowder. However, Mr. Ferrill refused to give the gunpowder to Mr. Brown. Mr. Brown decided to simplify things and asked Mr. Ferrill to kill Mr. Squires for him for $5,000.00. Mr. Ferrill indicated that he would do it, and two days later, the two men met once again and Mr. Brown gave Mr. Ferrill $200.00 for "expenses."

[¶7] On October 28, 2014, Mr. Brown's daughter, CM, overheard him talking about the plan to kill Mr. Squires. She in turn told her mother about the plan. Angela made arrangements for CM to spend the night at a friend's house, and called Mr. Squires to warn him. She also told an officer she worked with about the plan. The next morning, Angela found the pipe bomb in her garage and took a picture of the device. Meanwhile, that same day, Mr. Brown's plan continued as he and Mr. Ferrill traveled to Cheyenne to case Mr. Squires' home.

[¶8] The next day, on October 29, 2014, Angela showed a picture of the pipe bomb to her colleagues at the Laramie Police Department. They began to investigate, and on November 5, 2014, Mr. Brown was charged by Information with Conspiracy to Commit Murder in the First Degree, in violation of Wyo. Stat. Ann. §§ 6-1-303(a) and 6-2-101(a), for allegedly conspiring with William Ferrill and Eric Farrar to commit the murder of John Squires.

[¶9] The case proceeded to trial, after which the jury returned a guilty verdict after deliberating for just over an hour. Mr. Brown was sentenced to life in prison.

2

**DISCUSSION**

*Admission of Pipe Bomb Video*

[¶10]  Brown argues that the district court abused its discretion by allowing the State to show a video demonstrating the detonation of a bomb built by an officer supposedly similar to the bomb Brown was building.  Brown argues that the State did not produce the video in a timely manner, and besides that, it was not relevant.  The State suggests that because the defense's request for discovery was late, that excuses the tardiness of the video in question.

[¶11]  We review rulings on the admissibility of evidence for an abuse of discretion.

> This Court reviews alleged errors relating to the admission of evidence for an abuse of discretion. *Marquess v. State*, 2011 WY 95, ¶ 12, 256 P.3d 506, 510 (Wyo.2011). "Determining whether the trial court abused its discretion involves the consideration of whether the court could reasonably conclude as it did, and whether it acted in an arbitrary and capricious manner." *Lancaster v. State*, 2002 WY 45, ¶ 11, 43 P.3d 80, 87 (Wyo.2002) (citing *Trujillo v. State*, 2 P.3d 567, 571 (Wyo.2000)). A trial court's evidentiary rulings "are entitled to considerable deference," and will not be reversed "so long as there exists a legitimate basis for the trial court's ruling...." *Armstrong v. Hrabal*, 2004 WY 39, ¶ 10, 87 P.3d 1226, 1230 (Wyo.2004) (internal quotes and citations omitted).
>
> *Ortiz v. State*, 2014 WY 60, ¶ 67, 326 P.3d 883, 897 (Wyo. 2014).

*Bruce v. State*, 2015 WY 46, ¶ 19, 346 P.3d 909, 916 (Wyo. 2015).

[¶12]  At Mr. Brown's arraignment on December 17, 2015, the district court informed the parties that it would require all motions to be filed within thirty days and that the "failure to file motions that might be reasonably anticipated will constitute waiver."  The district court reiterated this, in writing, in its order reminding the parties that pretrial motions were due on or before January 16, 2015.  The defense's motion for discovery was filed on  February 12, 2015.  While the defense's motion was not timely, the district court nonetheless ordered the parties to complete their discovery by April 27, 2015.  In keeping with the general requirements of Rule 16 of the Wyoming Rules of Criminal

3

Procedure, which requires disclosure of items that are "within the possession, custody or control of the state," the prosecutor indicated that he had complied and would continue to do so. He pointed to the State's "open file" policy, "by which the State has and will continue to make available to the Defendant all reports, statements, documents or any other evidence that it has in its possession or control regarding this criminal matter that is discoverable pursuant to the Wyoming Rules of Criminal Procedure." The prosecutor also informed the defense and the court that "[t]he state understands and will comply with its ongoing duties to supplement this discovery pursuant to W.R.Cr.P. 16."

[¶13] On May 15, 2015, the State filed its second amended designation of exhibits and included Exhibit 18, the explosion demonstration video. The video, which was made and provided to the prosecutor the weekend before trial, was then provided to the defense.

[¶14] The trial court issued a pretrial order requiring the parties to comply with certain discovery requirements. Based on that order, under Rules 16(a)(1)(c) and (D), the State was required to disclose "books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof" and "the results of tests or experiments," which are within the "possession, custody or control" of the State. The district court ordered that discovery be completed by April 27, 2015.

[¶15] The State disclosed the video on May 16, 2015. Trial began on May 18, 2015. The State argues that its disclosure was timely because the officer did not make the video until the weekend before trial. It claims that it is not required to disclose materials it does not have. We disagree.

[¶16] Under *Emerson v. State*, 988 P.2d 518, 524-25 (Wyo. 1999), this Court ruled that the State had not violated its discovery obligation by producing a padlock just prior to trial because the prosecution and its agents were not aware of the item's existence until that time. We explained:

> The record is clear that neither the State nor its agents had the padlock in their possession until the Friday prior to trial when it was promptly produced. *See United States v. Marshall,* 132 F.3d 63, 68 (D.C.Cir.1998) (government cannot be required to disclose evidence which it neither possesses nor controls), and *United States v. Gatto,* 763 F.2d 1040, 1047–49 (9th Cir.1985) (government need only turn over those documents actually in its possession); *see also, United States v. Friedman,* 593 F.2d 109, 120 (9th Cir.1979); *State v. Babb,* 125 Idaho 934, 877 P.2d 905, 909 (1994); *Young v. State,* 146 Ga.App. 167, 245 S.E.2d 866, 867 (1978).

*Id.* at 524-25. The federal cases cited by *Emerson* and the plain language of Rule 16 recognize that the government is required to disclose evidence which it possesses or controls. Here, the State absolutely controlled the making of the video. The principle underlying the timely disclosure requirement is to prohibit the prosecution from engaging in gamesmanship in discovery matters.

> [A] prosecutor may not sandbag a defendant by "the simple expedient of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case for trial." *Brazel,* 102 F.3d at 1150 (quoting *United States v. Trevino,* 556 F.2d 1265, 1272 (5th Cir.1977)). Under such circumstances, that evidence is "plainly within [the prosecutor's] Rule 16 'control' ". *Id.*

*Emerson,* 988 P.2d at 524-25 (citations and footnote omitted). Here, we are concerned with Mr. Brown's proposition that the State purposefully ambushed the defense with the late production of the video. The State is not free to delay in "making" such evidence at the eleventh hour in order to avoid its duty to timely produce the evidence. Given that the production of and the delay in sharing the video was entirely within the State's control, we conclude that the admission of the video was error. The video should have been excluded because it was not produced by the State in accordance with the district court's own order.

[¶17] Even though the district court admitted the video evidence in error, we must consider whether the error was prejudicial or harmless. Error is prejudicial if there is a reasonable possibility that the verdict might have been more favorable to the defendant if the error had not been made. Prejudicial error requires reversal, while harmless error does not. *Dougherty v. State,* 2016 WY 62, ¶ 22, 373 P.3d 427, 434 (Wyo. 2016) (quoting *Lindstrom v. State,* 2015 WY 28, ¶ 22, 343 P.3d 792, 797 (Wyo. 2015)). Here, reversal is not required because the error in allowing the video into evidence was not prejudicial. Given the strength of the evidence, including the testimony of Brown's wife and co-conspirators, any error in admitting the video was harmless and should, therefore, be disregarded under W.R.Cr.P. 52. See, e.g., *Hernandez v. State,* 2001 WY 70, ¶ 12, 28 P.3d 17, 20-21 (Wyo. 2001).

***Admission of Bank Statement***

[¶18] Mr. Brown next argues that the district court also abused its discretion when it admitted a copy of Mr. Farrar's bank statement to show the deposit of $2,500.00 paid to him by Mr. Brown. Because this argument entails the admission of evidence, the same standard of review applies as in the foregoing discussion.

5

[¶19]   At trial, the defense objected to the admission of State's Exhibit 14, Eric Farrar's bank statement.  The bank statement reflected Mr. Farrar's account activity after Mr. Brown paid him for burning down his Arlington property.  The statement showed a deposit of $2,500.00 into Mr. Farrar's account.[1]  The statement was provided to defense counsel four days prior to trial.  While the statement was a record from August of 2014, the State asserted that it did not receive the statement until May 13, 2015.  The trial court allowed the statement over objection.

[¶20]   Mr. Brown argues that the State should have been made to explain why it did not request or receive the bank statement sooner.  The State counters, and points out that the fact that Mr. Farrar was provided a large sum of money from Mr. Brown was never in dispute.  Mr. Farrar testified to being paid by Mr. Brown at trial, and during his recorded interview with police at the time of his arrest.  Mr. Brown himself even admitted to providing Mr. Farrar with a "loan," albeit under different circumstances.

[¶21]   Similar to our conclusion regarding the admission of the pipe bomb video, we do find the same principles that govern the pipe bomb video govern the bank statement.  There was a disclosure cutoff.  The State did not timely request the bank statement, and therefore could not timely disclose it.  Thus, we must conclude that the admission of the bank statement into evidence was also error.  However, as above, reversal is not required.  The error in allowing the bank statement into evidence was not prejudicial.  The statement corroborated witness testimony, and therefore any error in its admission was harmless and should, therefore, be disregarded under W.R.Cr.P. 52.

### Rule 404(b) evidence

[¶22]   In his final argument, Mr. Brown argues that the trial court erred when it admitted character evidence under W.R.E. 404(b) and when it refused to give a limiting instruction with regard to the use of that same evidence.  After hearing the evidence at trial, the district court ruled that the arson conspiracy evidence was actually part of a larger conspiracy that included an agreement as to both crimes.  Consequently, it concluded that it did not fall under Rule 404(b).

[¶23]   The record here supports the district court's conclusion.  After a hearing on the matter, the district court stated in its order:

> 13. Regarding the May 25, 2014 arson of the Brown residence, Mr. Farrar has admitted to law enforcement officers that he burned down the Browns' house in Carbon County in May of 2014 in exchange for $5,000.00 paid by Mr. Brown.  At trial, the State intends to introduce testimony

---

[1] A total of $5,000.00 was paid to Mr. Farrar.  He only deposited half of that sum.

6

from Mr. Farrar that he wanted "$10,000 for both," meaning $10,000 to complete both the arson and the murder of Mr. Squire[s]. Thus, the State asserts that this conspiracy was really one, evolving conspiracy rather than two separate conspiracies.

14. If the State's allegations are correct, then the information related to the arson is not so much "404(b) evidence," as, rather, evidence of the *corpus delicti* of the one continuous crime that encompassed the arson and the murder plans. Then, evidence of the arson agreement would be entirely appropriate and relevant in proving the "one" conspiracy.

15. Assuming that is not the case – that these were, in fact, two separate conspiracies – then the Court is left to consider the admissibility of the prior alleged arson conspiracy in the charge related to [sic] the later alleged murder conspiracy.

16. Here, the State has sufficient evidence, between Mr. Farrar's confession and testimony; the burnt home; and other corroborating details, to support its claim that Mr. Brown and Mr. Farrar were involved in the prior arson conspiracy.

17. The existence of this previous illegal agreement (in which Mr. Brown allegedly paid Mr. Farrar to undertake a crime for Mr. Brown's benefit) demonstrates a plan and/or motive on the part of Mr. Brown of soliciting or conspiring with Mr. Farrar to undertake illegal activities, on behalf of Mr. Brown and in exchange for the payment of monies. And, in fact, according to Mr. Farrar, Mr. Farrar acted on these plans. There is a sufficient similarity between the previous conduct and the charged offense. Compare *State v. Andersen,* 860 P.2d 115, 117-18 (Mont. 1993). Further, this previous conspiracy provides relevant background information inasmuch as it corroborates that Mr. Brown and Mr. Farrar were partners during the charged conspiracy. *See U.S. v. Romero-Padilla ,* 583 F.3d 126, 130 (C.A.2 (N.Y.) 2009). It also may be relevant in corroborating Mr. Farrar's credibility, which is sure to be challenged at trial. Thus, the State has presented relevant and proper purposes for the admission of this evidence.
….

23. Taken as a whole, this Court is more swayed by the probative value of this evidence in light of information that makes the existence of the prior "bad act" and Mr. Brown's involvement therein clear and unparalleled in evidentiary value. This evidence is not cumulative, not stale, and not confusing. For all those reasons, it is appropriate to allow the introduction of this evidence at trial, subject to a proper limiting instruction to ensure the jury does not apply this evidence in an improper manner if Defendant so requests.

[¶24] The district court ruled that to the extent the evidence would be admissible under W.R.E. 404(b), the evidence was relevant and admissible. Later, however, the district court determined that the evidence showed one overarching conspiracy – not two separate conspiracies – and that the evidence need not be considered under Rule 404(b). Thus, the district court did not abuse its discretion by allowing the arson evidence at trial. See, e.g., *Cardenas v. State*, 2014 WY 92, 330 P.3d 808 (Wyo. 2014).

[¶25] Finally, Mr. Brown argues that the district court failed to offer a limiting instruction regarding the proffered Rule 404(b) evidence. Mr. Brown did not request a limiting instruction, nor did he object to the lack thereof. Furthermore, the district court ruled that the substantive evidence did not concern a prior bad act but, rather, showed that there was one all-encompassing conspiracy and that a limiting instruction would only confuse the jury. Based on the district court's ruling, a limiting instruction would have been inappropriate in this instance, even had Mr. Brown requested one.

## CONCLUSION

[¶26] Mr. Brown's conviction and sentence are affirmed.