# IN THE SUPREME COURT, STATE OF WYOMING

## 2020 WY 11

OCTOBER TERM, A.D. 2019

January 24, 2020

DEVIN JAY HARDMAN,

Appellant
(Defendant),

v.

S-19-0092

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Lincoln County*
*The Honorable Joseph B. Bluemel, Judge*

*Representing Appellant:*
R. Michael Vang, R. Michael Vang, P.C., Laramie, Wyoming. Argument by Mr. Vang.

*Representing Appellee:*
Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Christyne M. Martens, Senior Assistant Attorney General; Timothy P. Zintak, Assistant Attorney General. Argument by Mr. Zintak.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GRAY, Justice.**

[¶1]   A jury convicted Devin Hardman of two counts of operating a vehicle while under the influence of alcohol pursuant to Wyo. Stat. Ann. § 31-5-233(b)(i) (driving a vehicle while his blood alcohol concentration (BAC) was 0.08% or more) and Wyo. Stat. Ann. § 31-5-233(b)(iii) (driving while under the influence of alcohol to a degree which rendered him incapable of driving safely).  He appeals, claiming the admission of his BAC was error because the State failed to establish his blood analysis was performed according to methods approved by the Wyoming Department of Health, as required by Wyo. Stat. Ann. § 31-6-105(a).  Mr. Hardman argues the admission of his BAC results prejudiced him as to both charges brought by the State.  We affirm.

## ISSUES

[¶2]   The issues are:

1. Did the district court abuse its discretion when it admitted evidence of Mr. Hardman's BAC without requiring the State to produce the entire standard operating procedures manual and the linearity studies from the Wyoming Chemical Testing Program's calibration of the blood testing equipment?

2. Was Mr. Hardman denied due process or an opportunity to conduct an effective cross-examination at trial?

## FACTS

[¶3]   The facts leading to Mr. Hardman's arrest are not contested.  On the night of August 12, 2015, Mr. Hardman was driving and caused an automobile accident on U.S. Highway 89 just outside of Afton, Wyoming.  The driver of the other vehicle suffered a broken femur and lacerations on his right knee.  The injuries eventually required surgery.

[¶4]   Deputy John O'Connor of the Lincoln County Sheriff's Office was called to the scene.  When Deputy O'Connor approached Mr. Hardman, he observed Mr. Hardman's eyes were bloodshot and glassy, his speech was slow and slurred, and he smelled like alcohol.  Mr. Hardman admitted to consuming one beer and agreed to a field sobriety test.  After Mr. Hardman failed three standard field sobriety tests,[1] Deputy O'Connor

---

[1] Deputy O'Connor conducted a horizontal gaze nystagmus test, which requires the subject to follow a stimulus with the eyes moving back and forth.  "Jerking" movement of the eye indicates alcohol consumption.  Deputy O'Connor also conducted a "walk and turn" test and a "one leg stand" test.

1

conducted a portable breath test which indicated the presence of alcohol. Deputy O'Connor arrested Mr. Hardman and transported him to the Afton sheriff's office.

[¶5]   When they arrived at the sheriff's office, Deputy O'Connor read Mr. Hardman the Wyoming implied consent advisement and asked him to take a quantitative breath test. Mr. Hardman refused. Deputy O'Connor then successfully applied for a search warrant for a blood test and transported Mr. Hardman to the Star Valley Medical Center where he observed Angela Davis, a phlebotomist technician, draw Mr. Hardman's blood using a Wyoming blood draw kit. Deputy O'Connor then sealed and signed the blood samples and left them at the sheriff's office to be mailed the next day.

[¶6] Mr. Hardman's blood samples arrived at the Wyoming Chemical Testing Program's (Testing Program) laboratory in Cheyenne on August 17, 2015. The samples were logged in by an evidence technician, given a bar code and number for identification, and refrigerated. Moss Kent, a forensic toxicologist, tested the samples on August 18 and 19, 2015.[2] Each sample was tested twice. Mr. Hardman's blood samples tested positive for alcohol with BACs of 0.1064 and 0.1053. Throughout the testing process, Mr. Kent documented the procedures, the equipment calibrations, and the results. All documentation was contained in a litigation support package (LSP) which was provided to the State and Mr. Hardman.[3]

[¶7]   After receiving the LSP, Mr. Hardman filed several requests for further discovery and moved to suppress the BAC test results, claiming the Testing Program's methodology was flawed under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).[4] Eventually, the parties whittled Mr. Hardman's discovery to requests for: 1) the Testing Program's standard operating procedures (SOP) for chain of custody, storage, and refrigeration of blood samples; 2) the certificate of analysis relating to the control samples used during Mr. Hardman's test; and 3) the linearity studies used to validate the single point calibrator used in analyzing Mr. Hardman's blood samples. At a status hearing, the State informed the district court there were no SOPs for blood sample chain of custody, storage, or refrigeration. The certificate of analysis from the State's supplier of control materials was available and

---

[2] A forensic toxicologist is one who is certified to perform chemical analyses for law enforcement investigations.

[3] The LSP contained chain of custody information, worksheets, credentials of the toxicologist, calibration data, and control data for all samples in the test run and specifically for Mr. Hardman's samples. It also included the standard operating procedure for blood alcohol analysis, instrument maintenance sheets for the month, and quality control data for the month.

[4] If there is a challenge to proposed expert testimony, the district court uses the two-part *Daubert* test to determine its admissibility. *Stalcup v. State*, 2013 WY 114, ¶¶ 22–23, 311 P.3d 104, 110–11 (Wyo. 2013). Under the *Daubert* test, the court first determines whether the expert's methodology is reliable; and then it determines whether the proposed testimony is relevant, i.e., whether it fits the facts of the particular case. *Cooper v. State*, 2008 WY 5, ¶ 10, 174 P.3d 726, 729 (Wyo. 2008).

would be produced. The State argued the linearity study (used to determine reportable ranges when measuring equipment is placed into use) was an equipment control measure, and it was not used as a specific element of Mr. Hardman's test—therefore, the request exceeded discovery requirements under *Anderson v. State*, 2014 WY 13, ¶ 14, 317 P.3d 1108, 1113–14 (Wyo. 2014) (holding that "[t]he State only must provide information to the appellant related to his *own* chemical tests, nothing more"). The State asserted because the linearity study was not a control used for Mr. Hardman's blood test, the information was not material to his case.

[¶8] On January 26, 2017, the district court held a pre-trial hearing regarding the admissibility of Mr. Hardman's BAC. Mr. Kent, the State's trial expert, testified he had conducted Mr. Hardman's blood analysis and detailed the procedure he used in reaching his conclusion. Janine Arvizu, Mr. Hardman's trial expert, testified the Testing Program's procedures were not scientifically valid. After hearing from both experts, the district court denied Mr. Hardman's request for further discovery and ruled the BAC evidence would be admitted at trial.[5]

[¶9] The State originally charged Mr. Hardman with violation of Wyo. Stat. Ann. § 31-5-233(b)(i), driving a vehicle while his BAC was 0.08% or more. The State later added an alternative charge under Wyo. Stat. Ann. § 31-5-233(b)(iii), alleging he was driving while under the influence of alcohol to a degree which rendered him incapable of driving safely. In a special verdict form, the jury found Mr. Hardman guilty of both charges. The district court merged the charges and sentenced Mr. Hardman to two to five years of incarceration. Mr. Hardman timely appeals.

## DISCUSSION

I. *Did the district court abuse its discretion when it admitted evidence of Mr. Hardman's BAC without requiring the State to produce the entire standard operating procedures manual and the linearity studies from the Wyoming Chemical Testing Program's calibration of the blood testing equipment?*

[¶10] Mr. Hardman claims that Wyo. Stat. Ann. § 31-6-105(a) and (e) and Wyo. Stat. Ann. § 31-5-233(k) require the State to establish that testing of his blood samples strictly complied with the Testing Program's approved methods. He asserts the district court should have compelled the production of the Testing Program's entire SOP manual and the linearity studies from the testing equipment's initial calibration. He argues these

---

[5] After this hearing, Mr. Hardman entered a conditional no contest plea under W.R.Cr.P. Rule 11(a)(2) and filed an appeal with this Court. We determined his discovery-related issues were non-dispositive and remanded the case for further proceedings. *Hardman v. State*, 2018 WY 24, 413 P.3d 116, 117 (Wyo. 2018).

3

documents are necessary to establish the scientific methods that applied to this case and whether those methods complied with the statutory predicate. He then argues the district court admitted evidence of his BAC without compelling production of these materials, and that without the materials, the State failed to show strict compliance with Testing Program standards and consequently failed to provide sufficient evidence proving his BAC was 0.08 or higher beyond a reasonable doubt.

## A.  Standard of Review

[¶11] "The trial court has broad discretion in controlling discovery." *Trusky v. State*, 7 P.3d 5, 11 (Wyo. 2000); *Glob. Shipping & Trading, Ltd. v. Verkhnesaldincky Metallurgic Co.*, 892 P.2d 143, 145–46 (Wyo. 1995). "This Court reviews a trial court's discovery . . . rulings under the abuse of discretion standard." *Nelson v. State*, 2009 WY 37, ¶ 12, 202 P.3d 1072, 1075 (Wyo. 2009). The trial court's decision addressing the admissibility of evidence will also be set aside only for an abuse of discretion. *Requejo v. State*, 2019 WY 44, ¶ 7, 439 P.3d 747, 749 (Wyo. 2019). A trial court abuses its discretion if we find it could not reasonably conclude as it did; we will not reverse its decision if there is a legitimate basis for its ruling. *Id.* The party challenging the trial court's decision has the burden of showing an abuse of discretion. *Anderson*, ¶ 11, 317 P.3d at 1113.

## B.  Analysis

[¶12] A criminal defendant does not have a general constitutional right to discovery. *Gale v. State*, 792 P.2d 570, 577 (Wyo. 1990); *Capshaw v. State*, 714 P.2d 349, 351 (Wyo. 1986). "[W]hile a defendant may request or demand certain information from the State, he is entitled to the information only insofar as required by statute, rule or case law." *Ceja v. State*, 2009 WY 71, ¶¶ 11–13, 208 P.3d 66, 68 (Wyo. 2009). In this case, Wyo. Stat. Ann. § 31-6-105(e), W.R.Cr.P. Rule 16, and *Anderson* define the scope of discovery to which Mr. Hardman is entitled.

[¶13] Wyo. Stat. Ann. § 31-6-105(e) provides: "Upon the request of a person who undergoes a chemical test or tests as required by a peace officer, full information concerning the test or tests shall be made available to the person or his attorney." Wyo. Stat. Ann. § 31-6-105(e) (LexisNexis 2019). In *Anderson*, we addressed the requirements of Wyo. Stat. Ann. § 31-6-105(e) and determined:

> Wyo. Stat. Ann. § 31-6-105(e) [is] clear and unambiguous. The State only must provide information to the appellant related to his *own* chemical tests, nothing more. That is, "full information concerning the test or tests" taken by the appellant. To decide differently would require us to extend the provision to information that is not expressly required. The State complied with § 31-6-105(e) when it provided the

appellant with the results of his tests, the operational checklist used during his tests, the manual for using the subject machine in his case, and the certification records for the machine used.

*Anderson*, ¶ 14, 317 P.3d at 1113–14 (citation and quotation omitted).

[¶14] Rule 16 of the W.R.Cr.P. governs the extent of discovery in a criminal case. The rule states in pertinent part:

(C) Documents and Tangible Objects. — Upon written demand of the defendant, the state shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the state, and *which are material to the preparation of the defendant's defense* or are intended for use by the state as evidence in chief at the trial, or were obtained from or belong to the defendant.

(D) Reports of Examinations and Tests. — Upon written demand of a defendant, the state shall permit the defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession, custody, or control of the state, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the state, and *which are material to the preparation of the defense* or are intended for use by the state as evidence in chief at the trial.

W.R.Cr.P. 16(a)(1)(C)–(D) (emphasis added).

[¶15] We separately address the two items Mr. Hardman claims should have been produced: the SOP manual and the linearity studies.

[¶16] Mr. Hardman was convicted under Wyo. Stat. Ann. § 31-5-233(k), which states, "Chemical analysis of a person's blood, breath or urine to determine alcohol concentration or controlled substance content **shall be** performed in accordance with W.S. 31-6-105(a)." Wyo. Stat. Ann. § 31-5-233(k) (LexisNexis 2019) (emphasis added). In turn, Wyo. Stat. Ann. § 31-6-105(a) provides:

(a) Chemical analysis of the person's blood, breath or urine to be considered valid under this section, **shall be**

*performed according to methods approved by the department of health* and by an individual possessing a valid permit to conduct the analysis. Permits shall be issued by the department of health for this purpose. The department of health may promulgate and approve satisfactory methods in order to ascertain the qualifications of individuals permitted to conduct the analysis and shall issue to qualified individuals permits which are subject to termination or revocation by the department of health.

Wyo. Stat. Ann. § 31-6-105(a) (LexisNexis 2019) (emphasis added).

### 1. Standard Operating Procedures Manual

[¶17] The Testing Program's Quality Assurance Manual, at the time of Mr. Hardman's test, stated the Testing Program should have an SOP addressing specimen/sample preservation, transportation and holding times. T. Johnson and M. Moore, Wyoming Department of Health, *Quality Assurance Manual Chemical Testing Program*, § G Specimens/Samples, p. 11 (2005). The crux of Mr. Hardman's argument is that the Testing Program did not have a "separate SOP for preserving, transporting, and storing samples/specimens." He argues that because no SOP complying with the Quality Assurance Manual existed, he was entitled to the entire SOP manual to make sure no other section referenced these procedures.

[¶18] Mr. Hardman asserts that the refusal to disclose the entire SOP manual "made it impossible to determine whether there was actual compliance with the [Testing Program's] *relevant* approved methods (SOPs) that applied to this case." (Emphasis added.) He concludes the results of the tests measuring his BAC were inadmissible because the State did not establish compliance with Wyo. Stat. Ann. § 31-6-105(a).

[¶19] It is undisputed that the SOP generally governing the testing of blood samples for alcohol was provided to Mr. Hardman. The State admitted the Testing Program had no written SOPs for "preserving, transporting, and storing samples/specimens" as ordered by the Quality Assurance Manual. The State asserts the remainder of the SOP manual contains no procedures related to blood BAC testing, and Mr. Hardman provides no reasonable basis causing us to doubt the State's assertion.[6]

[¶20] Mr. Hardman cites to several opinions from courts in other states holding that strict compliance with statutes similar to Wyo. Stat. Ann. § 31-6-105(a) is "part of the

---

[6] Mr. Hardman did not seek an in-camera review of the SOP manual to determine whether the State correctly asserted it provided all SOPs relevant and material to his case.

predicate for admission of the test results." *Ex parte Mayo*, 652 So. 2d 201, 204 (Ala. 1994); *see also McDaniel v. State*, 706 So. 2d 1305, 1306–07 (Ala. Crim. App. 1997); *State v. Bosio*, 27 P.3d 636, 638–39 (Wash. Ct. App. 2001). All of these cases, however, recognize "that when the statutory predicate for admission is not established, the results of a chemical test for intoxication may still be admitted if the prosecution establishes a sufficient predicate under traditional evidentiary rules for the admission of scientific test results."[7] *Mayo*, 652 So. 2d at 209; *McDaniel*, 706 So. 2d at 1308 ("because the state did not lay a sufficient *traditional evidentiary predicate*, the trial court erred in allowing . . . the results of the . . . test" (emphasis added)).

[¶21] Wyoming has both rules and case law that apply here. In *Bunting v. Jamieson*, we adopted the *Daubert* analysis: "[f]irst, the [trial] court [is to] determine whether the methodology or technique used by the expert . . . is reliable[,]" and second, "the [trial] court must determine whether the proposed testimony 'fits' the . . . particular case." *Bunting v. Jamieson*, 984 P.2d 467, 471 (Wyo. 1999) (citations omitted). The purpose of the *Daubert* analysis is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Reichert v. Phipps*, 2004 WY 7, ¶ 7, 84 P.3d 353, 356 (Wyo. 2004) (citations omitted). The non-exclusive criteria that have been utilized to guide trial courts in making that first determination are:

> 1) whether the theory or technique in question can be and has been tested; 2) whether it has been subjected to peer review and publication; 3) its known or potential rate of error along with the existence and maintenance of standards controlling

---

[7] The *Mayo* court explained:
> The Court of Criminal Appeals has described such a predicate for admission of the results of a P.E.I. test without reliance on § 32-5A-194:
> > To establish a predicate for admitting the test results, without reliance on the statute, there should be evidence that:
> > (1) the theory underlying the photoelectric intoximeter test is valid and generally accepted as such;
> > (2) the intoximeter is a reliable instrument and generally accepted as such;
> > (3) the intoximeter test was administered by a qualified individual who could properly conduct the test and interpret the results; and
> > (4) the instrument used in conducting the test was in good working condition and the test was conducted in such a manner as to secure accurate results.

*Mayo*, 652 So. 2d at 209 (quoting *Moore v. State*, 442 So. 2d 164, 167 (Ala. Crim. App. 1983); *McDaniel v. State*, 506 So. 2d 360, 364 (Ala. Crim. App. 1986)).

the technique's operation; . . . 4) the degree of acceptance within the relevant scientific community[;] . . . [5)] the extensive experience and specialized expertise of the expert[;] . . . [6)] whether the expert is proposing to testify about matters growing naturally and directly out of research [he has] conducted independent of the litigation; and [7)] the non-judicial uses to which the method has been put[.]

*Id.* ¶ 8, 84 P.3d at 356 (citation omitted). Expert testimony is admissible if it meets the requirements of W.R.E. 702: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." W.R.E. 702.[8]

[¶22] Here, the district court held three hearings on Mr. Hardman's evidentiary challenges. Mr. Kent testified on the exact procedures he used when testing Mr. Hardman's blood samples. He established his credentials to conduct the test; he stated the procedures complied with generally accepted scientific methods approved in Wyoming; he testified the testing equipment was in good working condition; and he reported the test was conducted in a manner which would secure accurate results. Despite the Testing Program's failure to adopt SOPs required by the Quality Assurance Manual, the State established a sufficient predicate under traditional evidentiary rules for the admission of scientific test results.

[¶23] Recognizing the separate roles of the court and the jury, we have held that "[c]oncern about specific procedures goes to the reliability of [the] evidence and the weight given by the jury." *Springfield v. State*, 860 P.2d 435, 444 (Wyo. 1993).

> The district court should focus on whether accepted protocol was adequately followed in a specific case, but the court, in exercising its discretion, should be mindful that this issue would go more to the weight than to the admissibility of the evidence. Rarely should such a factual determination be excluded from jury consideration. With adequate cautionary instructions from the trial judge, vigorous cross-examination of the government's experts, and challenging testimony from defense experts, the jury should be allowed to make its own factual determination as to whether the evidence is reliable.

*Bean v. State*, 2016 WY 48, ¶ 31, 373 P.3d 372, 382 (Wyo. 2016) (citations omitted).

---

[8] Rule 702 was later amended May 20, 2019, effective August 1, 2019.

[¶24] The district court did not abuse its discretion when it admitted evidence of Mr. Hardman's BAC without requiring the State to produce the SOPs.

## 2. Linearity Study

[¶25] In addition to the SOPs, Mr. Hardman requested linearity studies used to determine the accuracy of the calibrator on the equipment used for Mr. Hardman's blood test as well as studies from the calibrator used immediately before and after Mr. Hardman's test.

[¶26] At the time of Mr. Hardman's test, Wyoming used a single point calibration method to establish the accuracy of its results. Linearity studies, which test minimum and maximum ranges, are performed whenever a new calibrator is introduced in the testing system. Mr. Kent explained the Testing Program uses a new calibrator every two to three months, depending on the number of alcohol tests conducted.

[¶27] The linearity study performed on the calibrator is used to ensure accuracy. The Testing Program uses known samples of different levels of alcohol for linearity studies. These samples are prepared using standards approved by the National Institute of Standards and Technology. The substance of each sample is extracted into pair samples which are tested twice at ten levels, ranging from a .02 through .5. This process is repeated five times. The results are entered into a Paradata calculator that produces linearity results. The results from every sample must be within plus or minus 5% of the known quantity of alcohol content. A negative control is then applied to make sure "the negative is going to be a negative."

[¶28] Mr. Kent testified the Testing Program also checks the accuracy of the machine prior to every batch run. Samples containing specific alcohol content controls are run through the machine and the chromatographic results show whether the machine is accurately measuring the samples.[9] The results of the accuracy test run before analyzing Mr. Hardman's blood samples were provided to Mr. Hardman in the LSP package.

[¶29] Mr. Hardman claims the control tests, alone, were insufficient to show strict compliance with the Testing Program's approved methodology. Without production of the linearity studies, he asserts the State failed to establish strict compliance and his BAC results were not admissible at trial. The State contends that because the linearity study was not used to test Mr. Hardman's blood samples, production of the linearity studies was outside the discovery required under *Anderson*.

---

[9] Mr. Hardman does not dispute the third-party Certificate for Controls was provided to him in discovery.

[¶30] In *Anderson*, we considered whether the phrase "full information" in Wyo. Stat. Ann. § 31-6-105(e) entitled the appellant "to all data regarding the subject machine . . . regardless of whether it is generic information, related to another case, or directly related to his case." *Anderson*, ¶ 13, 317 P.3d at 1113. We determined the appellant was entitled to information related to his *own* chemical tests, nothing more. *Id.* ¶ 14, 317 P.3d at 1113. The linearity study performed on the calibrator used in testing Mr. Hardman's blood samples is directly related to Mr. Hardman's test and comprises part of the "full information" regarding his test. Mr. Kent testified he would be able to provide the linearity study done on the calibrator used for Mr. Hardman's blood analysis. Mr. Hardman was entitled to this information.

[¶31] Even though the district court should have compelled production of the linearity study related to the calibrator for Mr. Hardman's blood samples test, we must consider whether the error affected the admissibility of Mr. Hardman's BAC result. If not, the error was harmless. *Brown v. State*, 2016 WY 107, ¶ 17, 383 P.3d 631, 635 (Wyo. 2016). "An error is prejudicial if there is a reasonable probability that the verdict would have been more favorable to the appellant had the error not occurred." *Swett v. State*, 2018 WY 144, ¶ 42, 431 P.3d 1135, 1146 (Wyo. 2018) (citations omitted). "Prejudicial error requires reversal, while harmless error does not." *Dougherty v. State*, 2016 WY 62, ¶ 22, 373 P.3d 427, 434 (Wyo. 2016) (quoting *Lindstrom v. State*, 2015 WY 28, ¶ 22, 343 P.3d 792, 798 (Wyo. 2015)). Here, reversal is not required because the error was not prejudicial.

[¶32] As discussed above, Mr. Kent testified that the data related to Mr. Hardman's tests did not indicate the results were inaccurate or unreliable. Mr. Hardman was provided calibration and control data for the run, instrument maintenance sheets for the month, and quality control data for the month. In *Anderson* we noted, "if there was something wrong with the tests taken by the appellant, the information provided to him—test results, operational checklist, and litigation support package containing the maintenance and certification records—surely would have flagged the problem." *Anderson*, ¶ 18, 317 P.3d at 1115.

[¶33] Mr. Hardman does not argue the LSP flagged an accuracy problem. Rather, he contends he was unable to argue the Testing Program did not strictly comply with approved methodology without the linearity study. However, as we stated earlier, "when the statutory predicate for admission is not established, the results of a chemical test for intoxication may still be admitted if the prosecution establishes a sufficient predicate under traditional evidentiary rules for the admission of scientific test results." *Mayo*, 652 So. 2d at 209. The State met this burden here. The district court's error in failing to compel production of Mr. Hardman's calibrator linearity study under Wyo. Stat. Ann. § 31-6-105(e) was harmless and did not affect the admissibility of the BAC results.

10

***II. Was Mr. Hardman denied due process or an opportunity to conduct an effective cross-examination at trial?***[10]

[¶34] Mr. Hardman argues that the failure to disclose the SOP manual and the linearity study violated his constitutional right to due process and the opportunity to conduct an effective cross-examination rebutting the BAC measurement under the Sixth and Fourteenth Amendments of the United States Constitution and Article I, §§ 6 and 10 of the Wyoming Constitution. He claims the absence of these materials deprived him of the opportunity to attack Mr. Kent's credibility in light of later changes to the Testing Program's chemical testing procedures.[11]

**A. Standard of Review**

[¶35] "We generally review a claim 'that a constitutional right has been violated by applying our *de novo* standard of review.'" *Martinez v. State*, 2006 WY 20, ¶ 6, 128 P.3d 652, 656 (Wyo. 2006) (citation omitted). "The party claiming an infringement of his right to due process has the burden of demonstrating both that he has a protected interest and that such interest has been affected in an impermissible way. The question is whether there has been a denial of fundamental fairness." *KC v. State*, 2015 WY 73, ¶ 16, 351 P.3d 236, 241 (Wyo. 2015) (citations omitted).

[¶36] When considering a Confrontation Clause violation claim:

> [T]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise

---

[10] Mr. Hardman has presented no analysis to support an independent examination of the Wyoming Constitution's due process or confrontation provisions. Therefore, we will not apply a separate analysis inconsistent to the federal constitution. *Sheesley v. State*, 2019 WY 32, ¶ 16, 437 P.3d 830, 838 (Wyo. 2019); *Bear Cloud v. State*, 2014 WY 113, ¶ 14, 334 P.3d 132, 137 (Wyo. 2014).

[11] The Testing Program was reconfigured shortly before Mr. Hardman's trial. The Testing Program had switched to a three-point calibration procedure, and the Wyoming Department of Criminal Investigation took over blood testing in March 2019. There is no evidence these changes were connected to the accuracy of Mr. Hardman's test in 2015.

11

permitted, and, of course, the overall strength of the prosecution's case.

*Kovach v. State*, 2013 WY 46, ¶ 99, 299 P.3d 97, 126 (Wyo. 2013) (citation omitted).

## B.     Analysis

[¶37] "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a 'meaningful opportunity to present a complete defense.'" *Stalcup*, ¶ 19, 311 P.3d at 110 (citations omitted). "Although there is no constitutional right to discovery, a defendant has a constitutionally protected right to present a defense." *Kovach*, ¶ 50, 299 P.3d at 112 (citations omitted). However, "the Confrontation Clause only guarantees 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Pennsylvania v. Ritchie*, 480 U.S. 39, 53, 107 S. Ct. 989, 999, 94 L. Ed. 2d 40 (1987) (citation omitted).

[¶38] "In order for there to be a violation of the right of confrontation, a defendant must show more than just a denial of the ability to ask specific questions of a particular witness." *Kovach*, ¶ 98, 299 P.3d at 125 (citations omitted).

> Rather, a defendant must show that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness . . . to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.

*Id.* ¶ 98, 299 P.3d at 125–26 (citations and internal quotation marks omitted).

[¶39] The district court's failure to compel production of the linearity study used to calibrate the machine on which his test was conducted did not violate Mr. Hardman's constitutional rights. Undoubtedly, Mr. Kent's testimony regarding the BAC in Mr. Hardman's blood was important to the prosecution's case. However, the linearity study itself was either cumulative or immaterial to Mr. Hardman's defense.

[¶40] Mr. Hardman claims the absence of the linearity study rendered him unable to confront the accuracy and reliability of the BAC measurement. We disagree. Mr. Hardman presented abundant evidence challenging the Testing Program's accuracy. On cross-examination of Mr. Kent, Mr. Hardman elicited the calibrator was made in-house, and when the testing was done, the Testing Program was not certified by an outside agency. Mr. Kent admitted that a negative control is not performed after every sample to

ensure there is no carryover from the previous sample. Mr. Kent testified that the optimal standard is ten milliliters but did not remember how much sample was received in the tubes containing Mr. Hardman's blood samples. Mr. Kent agreed Mr. Hardman's samples were not refrigerated from the time taken on August 13, 2015, until logged in on August 17, 2015. Mr. Hardman introduced authoritative studies showing sample storage at room temperature may cause an elevated alcohol level if a yeast called candida albicans is present. Mr. Kent testified the Testing Program used a single-point calibration to test Mr. Hardman's blood samples, but Wyoming is now using a three-point calibration system. Mr. Kent wrote a SOP for using the new system. Mr. Hardman elicited Mr. Kent's confirmation that he had not provided the linearity validation study generated for the machine used to test Mr. Hardman's samples and that the linearity study was not part of the LSP. Mr. Kent also confirmed the manual for the equipment cautions that a disadvantage of a single level calibration is that linearity is assumed, that the assumption is not always true, and it can lead to inaccurate results.

[¶41] Mr. Hardman then presented testimony from his expert, Ms. Arvizu, a laboratory quality auditor. Ms. Arvizu testified that she conducts data audits "to help [her] clients understand whether or not a particular result was generated in accordance with all the rules and requirements that scientists have determined are necessary for reliable tests." From her perspective, she identified numerous shortcomings in the Testing Program's methods: the samples lacked a sufficient quantity of blood to avoid the possibility of contamination; the failure to run a blank specimen between each sample to negate the possibility of carryover from one sample to the next created reliability questions; the reference materials were also questionable as they were not provided by a certified manufacturer; the use of an "unusually high baseline" reduced the opportunity to identify chromatography problems in the results; and the SOP for blood analysis did not include the calibration method and, as a result, was "significantly incomplete."

[¶42] Ms. Arvizu confirmed she was not given the linearity study. More importantly, she opined a single point calibration method is never appropriate to quantitatively determine an alcohol concentration level. She stated, "[w]hen the number matters, single point calibration is never acceptable. . . . Use of control samples is not a substitute for having a range of calibrators." She concluded the quantitative analysis for BAC was not reliable.

[¶43] There was no "denial of fundamental fairness" at Mr. Hardman's trial. *KC*, ¶ 16, 351 P.3d at 241–42 (citations omitted). Impeachment of Mr. Kent was important to Mr. Hardman's case, and he effectively embraced this opportunity and presented numerous challenges to Mr. Kent's testimony. Mr. Hardman was not denied his constitutional right to due process or an opportunity to confront the State's witnesses.[12]

---

[12] Mr. Hardman argues the admission of his BAC results prejudiced him as to both charges brought by the State. The State argues even if there was prejudicial error in the admission of Mr. Hardman's BAC

## CONCLUSION

[¶44] The district court did not abuse its discretion in denying the production of the SOP manual. While the linearity study conducted when creating the calibrator for the machine used for Mr. Hardman's blood test should have been produced, its absence did not prejudice Mr. Hardman as to either charge. The district court did not err in admitting the BAC results. Mr. Hardman was not denied his constitutional due process or confrontation rights. Affirmed.

---

regarding his conviction for driving with a BAC of 0.08% or more under Wyo. Stat. Ann. § 31-5-233(b)(i), it would not affect his conviction under Wyo. Stat. Ann. § 31-5-233(b)(iii) alleging he was driving while under the influence of alcohol to a degree which rendered him incapable of driving safely. We need not reach the issue because we find no error in the admission of Mr. Hardman's BAC.