# IN THE SUPREME COURT, STATE OF WYOMING

# 2020 WY 105

**APRIL TERM, A.D. 2020**

**August 10, 2020**

JILL LUBING,

Appellant
(Plaintiff),

v.

DAVID TOMLINSON, M.D. and
GRAND ANESTHESIOLOGY
SERVICES, P.C.,

Appellees
(Defendants).

S-19-0067, S-19-0068

*Appeal from the District Court of Teton County*
*The Honorable Steven K. Sharpe, Judge*

*Representing Appellant:*
> Robert L. Stepans and Ryan R. Shaffer, Meyer, Shaffer & Stepans, PLLP, Missoula, Montana.

*Representing Appellees:*
> Jeffrey C. Brinkerhoff, Jeffrey C. Brinkerhoff, P.C., Casper, Wyoming; Scott P. Klosterman, Williams, Porter, Day & Neville, P.C., Casper, Wyoming.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GRAY, Justice.**

[¶1]    Jill Lubing filed a medical negligence lawsuit against anesthesiologist David Tomlinson, M.D., claiming he negligently performed a regional block[1] procedure in preparation for surgery to repair Mrs. Lubing's broken wrist.  She also alleged Dr. Tomlinson's employer, Grand Anesthesiology Services, P.C., was vicariously liable for Dr. Tomlinson's negligence.  Following an eight-day trial, the jury unanimously found Dr. Tomlinson was not negligent.  Mrs. Lubing appeals.  We affirm.

## *ISSUES*

[¶2]    The issues are:

> 1.  Did the district court abuse its discretion when it refused to investigate a juror's concerns regarding damages?
>
> 2.  Did the district court abuse its discretion when it allowed a defense witness to testify to Dr. Tomlinson's character for truthfulness?

## *FACTS*

### A.    Mrs. Lubing's Accident and Surgeries

[¶3]    On the afternoon of March 20, 2015, Mrs. Lubing fell from a horse and went to the emergency room at St. John's Medical Center in Jackson, Wyoming.  An x-ray revealed that she had a broken wrist.  She discussed her treatment options with Dr. Rafael Williams, an orthopedic surgeon.  Mrs. Lubing was given the choice of allowing the break to heal while splinted or to repair the wrist surgically.  Mrs. Lubing opted for surgery because the estimated recovery time was significantly shorter.  Mrs. Lubing told Dr. Williams that in the past she had experienced negative side effects from general anesthesia, and she decided to receive a local anesthetic (or regional block) in lieu of general anesthesia.[2]

[¶4]    Dr. Tomlinson was called to perform the regional block.  His procedure notes, dictated the day after surgery, reflect that he spoke with Mrs. Lubing regarding the regional block and she signed a consent for the procedure.  When Dr. Tomlinson began to

---

[1] The point of a regional block, or a nerve block, is to anesthetize the nerves in a particular region.

[2] In her deposition and at trial, Mrs. Lubing denied asking for the regional block, but she did not have a clear memory of the events after Dr. Williams initially set her wrist in the emergency room.  Dr. Williams and Dr. Tomlinson testified that Mrs. Lubing had "actually requested" the regional block.

1

administer the anesthetic, he was assisted by nurse Barbara Falk (Nurse Falk) and nurse anesthetist Shawn Wright (CRNA Wright). About half-way into the procedure, Mrs. Lubing "turned her head towards [Dr. Tomlinson] with a strange look." He stopped the procedure, but Mrs. Lubing immediately began to have seizure activity. Dr. Tomlinson asked Nurse Falk to "hit the code button" while CRNA Wright retrieved appropriate medication. Mrs. Lubing lost consciousness and went into respiratory failure. The restorative medications took effect while Dr. Williams, one of several doctors and nurses who had responded to the code, began cardiopulmonary resuscitation. Within minutes, Mrs. Lubing was resuscitated, her color returned, and the surgery was cancelled. Mrs. Lubing was transferred to the intensive care unit where she remained overnight. Her wrist surgery was then completed under general anesthesia without incident. She was discharged the following day.

[¶5]    In July 2017, Mrs. Lubing filed a complaint. She alleged Dr. Tomlinson's medical negligence in performing the regional block caused a life-threatening condition known as Local Anesthetic Systemic Toxicity (LAST), which resulted in a permanent neurocognitive disorder. The complaint also alleged Dr. Tomlinson's employer, Grand Anesthesiology Services, P.C., was vicariously liable for her injury. Mrs. Lubing sought damages for, among other things, physical and mental pain and suffering, and loss of enjoyment of life. An eight-day trial began on December 11, 2018.

[¶6]    On appeal, Mrs. Lubing first challenges the district court's refusal to interview a juror who spoke with the court bailiff after the jury was empaneled. She next contests the district court's admission of witness testimony regarding Dr. Tomlinson's truthful character.

**B.    Voir Dire**

[¶7]    During jury voir dire, Mrs. Lubing's counsel said:

> So I think what looks like the last thing that I'll talk to everybody about is that you're going to hear evidence in this case regarding emotional damages and pain and suffering.
>
> And what I would ask is if there is anyone here who would have trouble, even just a little bit, of giving money or of allowing money for pain and suffering or emotional damages? Is there anybody who would have trouble with that?

One of the prospective jurors expressed some reservation with that concept, explaining he was unsure how to quantify such damages. After some discussion, that juror said, "I would have to do some soul searching to award something like that on a pain and

2

suffering, you know." Several jurors agreed with this statement. In particular, Juror E.G. responded:

> I don't necessarily have anything to add, just that I agree with what they already said, that I would have to do some soul searching for sure to think about awarding something for pain and suffering.

.   .   .

> . . . I think the thing I find hardest about it is not that I don't think it exists as much as in court with the restrictions that you place on the evidence. And looking at these things, you know, they are cut and dry. And then all of a sudden they're asking the jurors to make a distinction that doesn't have boundaries is hard because -- for an individual to make a decision. Make sense?

> [PLAINTIFF'S COUNSEL]: Yes. Thank you. I appreciate that. Anyone else?

Mrs. Lubing's counsel did not ask further questions of Juror E.G. or the other jurors who expressed reservations on this topic. The party's counsel then passed the jury—including Juror E.G.—for cause.

[¶8]    After opening statements and the partial testimony of Mrs. Lubing's first witness, the court bailiff told the district court that Juror E.G. had approached the bailiff during the break. The bailiff said Juror E.G. "had a question . . . about medical expense damages." The district court allowed both parties to question the bailiff about Juror E.G.'s communication.

[¶9]    The following day, the court held an in-chambers conference with counsel. Mrs. Lubing's counsel stated: "We don't know the contours of what [the juror's] concerns are. But it sounded like it is potentially some sort of prejudice that she's very concerned about, and also that she would come forward and ask that a message be delivered to Your Honor." Counsel asked that the court hear from the juror "[a]nd then if we need to voir dire [the juror] further, we do."[3] Dr. Tomlinson's counsel asserted that the bailiff told him that the juror did not ask to relay a message to the district court or for further action. He argued that reopening voir dire any time a juror has a question would set a dangerous precedent. He contended that if the juror was confused, any confusion would be clarified

---

[3] Mrs. Lubing's counsel did not ask to call the bailiff in order make an offer of proof on the record.

when the jury was instructed on damages. The district court ruled it would not reopen the voir dire. It reasoned: (1) there was no indication by the juror that she could not be fair and impartial; (2) the jury was questioned on the issue of damages during voir dire; (3) the jury panel had been passed for cause; (4) the juror had not asked to speak to the court; and (5) the jury would later be instructed on the law as to the measure of damages.

## C.    Testimony Regarding Dr. Tomlinson's Truthful Character

[¶10] At trial, Mrs. Lubing claimed Dr. Tomlinson negligently injected anesthetic into her blood stream, causing LAST. If anesthetic is introduced into the bloodstream, it can numb the heart and the brain. When this occurs, the patient may experience seizures, cardiac arrest, and cardiopulmonary collapse. Mrs. Lubing alleged Dr. Tomlinson failed to follow basic safety protocols to prevent or minimize the damage caused by an intravascular injection. Specifically, Mrs. Lubing alleged Dr. Tomlinson did not use sufficient preprocedural oxygen and sedative medication to reduce seizure activity; did not include epinephrine in the anesthetic mixture to provide a check against the anesthetic travelling to the heart or brain; did not use ultrasound and doppler color to properly monitor the placement of the needle;[4] and Dr. Tomlinson's notes indicated he continued to inject anesthetic despite the "relatively negative" aspiration results.[5] The aspiration must be completely negative to avoid an intravascular injection.

[¶11] Dr. Shari Peach, Mrs. Lubing's expert anesthesiologist, testified that, in her opinion, Dr. Tomlinson failed to meet the standard of care. She based her testimony on her review of Mrs. Lubing's medical records and deposition testimony of other witnesses. Dr. Peach testified Dr. Tomlinson's notes failed to reference several protective protocols. Based on these omissions, Dr. Peach assumed the protocols were not performed. While Dr. Peach initially questioned whether Mrs. Lubing was appropriately monitored—Dr. Tomlinson's notes did not mention monitoring—at trial she stated she no longer had those misgivings because "everyone seems to say that [Mrs. Lubing] was in fact monitored, though it's not documented."[6] Next, Dr. Peach opined that Dr. Tomlinson's actions fell below the standard of care in failing to give Mrs. Lubing a preprocedural sedative to decrease the severity of any potential seizure. Dr. Peach further concluded Dr. Tomlinson should have used an oxygen mask to provide enough oxygen to "prevent immediate desaturation" in the event of a LAST episode.[7] She also criticized Dr. Tomlinson's decision to forego the use of epinephrine. She explained epinephrine causes a patient's heart rate to increase if the anesthetic travels to the heart. This alerts a doctor

---

[4] An ultrasound with color doppler allows a doctor to distinguish between blood vessels and nerves.

[5] "Aspiration" is inserting the needle and then pulling back on the syringe to make sure no blood returns to the syringe. Blood indicates the needle is in or near a vein. Numbing medication injected in the bloodstream may result in neurotoxicity and cardiac toxicity.

[6] Dr. Peach was referring to the deposition testimony of the medical staff at the procedure.

[7] Mrs. Lubing received oxygen through a nasal cannula.

4

that something is amiss.  She faulted Dr. Tomlinson for not doing a "continuous aspiration" rather than aspirating only before each injection of the anesthetic.  Dr. Peach's overriding concern was the description of aspiration in Dr. Tomlinson's notes.  Dr. Peach read this description aloud to the jury: "Several points throughout the brachial plexus were chosen to administer local anesthetic, and this was done with what appeared to be relatively negative aspiration."  Dr. Peach testified she had never seen the phrase "relatively negative aspiration," and anything other than a clear aspiration indicates "hazardous territory."  She also testified that Dr. Tomlinson had not noted his use of an ultrasound wand or color doppler in his deposition or notes.  The failure to use either technique would violate the standard of care.  On cross-examination, she said if Dr. Tomlinson testified he had used these techniques, she would "believe him."

[¶12]  Mrs. Lubing was the next witness.  During opening statement, Mrs. Lubing's attorney told the jury the informed consent sheet was missing.  Mrs. Lubing's attorney did not question her on this subject during her direct examination.  Following her testimony, several jury questions on this topic were posed to Mrs. Lubing.  She testified she was not informed of the risks of the regional block.  During cross-examination, Dr. Tomlinson's counsel used Mrs. Lubing's deposition testimony to impeach these answers.  In her deposition, Mrs. Lubing had testified that she did not remember anything after Dr. Williams set her wrist until she woke up in the ICU.  Therefore, she could not remember if Dr. Tomlinson had discussed the risks of the local anesthetic or if she had signed an informed consent.

[¶13]  Dr. Tomlinson was the next witness to testify relevant to the issues on appeal.  On direct examination, he testified "relatively negative" in his notes was a misstatement.  The aspiration prior to injection was negative—there was no blood in the tubing.  He agreed complications would be expected if anesthetic were injected when there was something other than a negative aspiration.  Dr. Tomlinson explained he believed he used the term "relatively" before "negative" as a "filler."  He noted that he used the same term, "relatively," three times during the dictation.

[¶14]  Due to scheduling constraints, Dr. Williams was called to testify after Dr. Tomlinson's direct examination but before Dr. Tomlinson's cross-examination.  Defense counsel asked Dr. Williamson, "Doctor, based upon your working with Dr. Tomlinson, your interactions with him in -- professionally and in any setting that you've been, have you found him to be honest and trustworthy, or does he shade the truth or hedge on the truth?  What has been your experience?"  Mrs. Lubing's counsel objected based on "improper vouching."  The trial court overruled the objection and told defense counsel "you could ask him if he's familiar with his general reputation as to truthfulness."  After the court's ruling, the following exchange ensued:

5

| | |
|---|---|
| [Defense Counsel:] | Sure. Doctor, are you familiar with Dr. Tomlinson's general reputation for truthfulness? |
| [Dr. Williams:] | Yes. |
| [Defense Counsel:] | And what is that? |
| [Dr. Williams:] | Dave and I are good colleagues. . . . I have tremendous respect for him. I think he handles my patients and the staff that we work with exceptionally well. And I've never -- |
| The Court: | That's not the question, Doctor. It is simply about truthfulness. |
| [Dr. Williams:] | Sorry, sir. I have never found him to be anything but truthful. |

[¶15] Following Dr. William's testimony, Dr. Tomlinson returned to testify on cross-examination. Mrs. Lubing's counsel initiated the following series of questions:

Q: . . . [L]et's talk about your choice of words right here. This last sentence, would you read that to the jury.

A: [Reading] "Several points throughout the brachial plexus were chosen to administer local anesthetic. And this was done with what appeared to be relatively negative aspiration."

Q: And what did you mean by "relatively negative?"

A: Negative.

Q: Do you remember taking a deposition in this case --

A: Oh, yes.

.   .   .

Q: . . . I'm going to hand you the original copy of your deposition.

A:    Sounds good.

Q:    All right.  I'm going to . . . direct your attention to Page 219, Dr. Tomlinson.  Go down to Line 23. . . .

A:    Yes.

Q:    So my question to you was: "Is that what you meant, that you got some of your anesthesia?"

      And do you remember we were talking about whether or not you could have been charting that you saw some of your own anesthesia get back into the tubing?

A:    Correct.

Q:    And could you just read, starting on Line 25 on 219 going through Line 7 on 220, would you read to the jury what your response was on that day when your deposition was taken.

A:    "I don't know what I meant.  I mean, this was, you know, a tough time for me, too. . . . I've been waiting my whole career for this, and I misspoke. . . . I didn't sit down and craft this thinking you would chop it up three years later.  I just tried to describe it the best that I could."

                    .    .    .

Q:    And you would agree that "relatively negative" doesn't mean negative?

A:    Depends on what you're referring to.

Q:    And that you charted this the day after it happened?

A:    Correct.

Q:    Much closer in time to the event than today?

A:    That's correct.

Q:     Certainly closer in time than your deposition; is that right?

A:     That's true.

Q:     And you weren't thinking about litigation at that point; is that right?

A:     I wasn't in my memory.

Q:     And so you were trying to do your best to dictate what you saw; is that right?

A:     Sure.

Q:     And that's what we have: "Appeared to be relatively negative aspiration;" is that right?

A:     Correct.

Additional facts will be added as necessary. *See infra* Dr. Neal's testimony at ¶ 44.

[¶16] On December 20, 2018, the jury unanimously found Dr. Tomlinson was not negligent. The district court issued its Final Judgment and Order Allowing Costs to Defendants as Prevailing Parties on January 18, 2019. Mrs. Lubing timely appealed from this judgment.

## *DISCUSSION*

### I.     *Did the district court abuse its discretion when it refused to investigate a juror's concerns regarding damages?*

[¶17] Mrs. Lubing argues that the district court erred when it refused to reopen voir dire after Juror E.G. spoke with the bailiff. She contends that, although her counsel had passed the juror for cause, the trial court had a duty to conduct further inquiry to ensure a fair and impartial trial.[8]

---

[8] We do not consider an affidavit submitted by Mrs. Lubing from an investigator who interviewed Juror E.G. on January 22, 2019. The affidavit is inadmissible hearsay under W.R.E. 801(c), and consideration of its contents is precluded under W.R.E. 606(b) (A juror may not testify as to any matter regarding the "effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict . . . or concerning his mental processes in connection therewith . . . .").

## A.    Standard of Review

[¶18]  We review a trial court's decisions related to voir dire for an abuse of discretion. A trial court's determination as to whether a prospective juror should be excused for cause will not be disturbed, absent an abuse of discretion.  Wyo. Stat. Ann. §§ 1-11-203, 7-11-105; *Schwenke v. State*, 768 P.2d 1031, 1034 (Wyo. 1989).  It is our long-standing view that:

> Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously.

*Ecocards v. Tekstir, Inc.*, 2020 WY 38, ¶ 11, 459 P.3d 1111, 1115–16 (Wyo. 2020) (quoting *Burnham v. Coffinberry*, 2003 WY 109, ¶ 5, 76 P.3d 296, 298 (Wyo. 2003)).

## B.    Analysis

[¶19]  Mrs. Lubing maintains the "trial judge had a non-discretionary duty to inquire into, and understand, the prejudicial concerns raised by Juror E.G. on the first day of trial . . . ."  The right to a fair and impartial jury is protected by due process of law.  *Skinner v. State*, 2001 WY 102, ¶ 14, 33 P.3d 758, 763 (Wyo. 2001) (quoting *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982)).  "Trial judges are charged with the duty of seeing that a jury of competent, fair, and impartial persons is impaneled." *Wardell v. McMillan*, 844 P.2d 1052, 1062 (Wyo. 1992); *Redwine v. Fitzhugh*, 78 Wyo. 407, 417, 329 P.2d 257, 260 (1958).  "The object of *voir dire* is to afford litigants an opportunity to explore whether prospective jurors have such biases and prejudices as would interfere with their responsibility to fairly decide a case."  *Wardell*, 844 P.2d at 1062; *Schwenke*, 768 P.2d at 1033.  To this end, the scope and extent of voir dire are generally within the discretion of the trial judge.  *Wardell*, 844 P.2d at 1062.  "A trial court abuses its discretion when it limits the scope of *voir dire* in a manner which is unreasonable under the circumstances."  *Id.*; *Smith v. State*, 773 P.2d 139 (Wyo. 1989).

[¶20]  Dr. Tomlinson argues Mrs. Lubing waived her objection to Juror E.G. because the jury was empaneled without objection.  Generally, a "failure to challenge a juror, and then later acceptance of the panel at trial, waives any objection to the service of a particular juror."  *Pickering v. State*, 2020 WY 66, ¶ 36, 464 P.3d 236, 251 (Wyo. 2020) (citing *Benjamin v. State*, 2011 WY 147, ¶ 30, 264 P.3d 1, 9 (Wyo. 2011) (quoting *Kerns v. State*, 920 P.2d 632, 635 (Wyo. 1996))).  Mrs. Lubing maintains waiver does not apply because new information of potential bias was discovered after the jury had been

impaneled. *See* W.R.C.P. 47(f) ("During trial or deliberation, the court may excuse a juror for good cause.").

[¶21] We considered waiver of the challenge to a seated juror in *Lopez v. State*, 544 P.2d 855, 861–62 (Wyo. 1976). In *Lopez*, the day after two defendants were convicted on a rape charge, a female juror (first juror) seated in the matter telephoned another of the female jurors (second juror). She revealed that some six years previously, she had been the victim of a rape by two men under circumstances similar to those in the *Lopez* case. The second juror reported this information to counsel for the defendants. Counsel obtained her affidavit recounting the conversation. This affidavit was attached to motions for a new trial on behalf of the defendants. The county attorney then obtained an affidavit from the first juror. After a hearing, the district court denied the motions for a new trial. *Id.* at 858–59.

[¶22] On appeal, we affirmed, concluding "that under the circumstances of this case the right to raise the question of the impartiality of the jury with respect to this particular matter was waived." *Id.* at 860. We said:

> A failure to directly and plainly examine jurors with respect to a particular basis for bias or prejudice, which later is developed, constitutes a waiver of that ground. It is the obligation of the [parties] to examine jurors on voir dire and discover by proper investigation facts affecting their qualifications, and then to seasonably raise that objection with respect to any member of the panel. There is no showing in this case that the [parties'] right to fully question the jury, as it was being organized, was in any way abridged or interfered with. Under the circumstances the defendants waived the right to complain of the prior experience of the female juror as possible bias or prejudice.

*Id.* at 861–62.

[¶23] Here, Juror E.G.'s concerns about noneconomic damages—and the concerns of other jurors as well—were known to Mrs. Lubing's counsel before the jury was empaneled. Counsel was not prevented from conducting further voir dire to explore the parameters of these concerns. Rather, counsel chose to move to another topic. Under these circumstances, Mrs. Lubing's challenge to this particular juror was waived. *See Wilmore v. State*, 602 S.E.2d 343, 346 (Ga. Ct. App. 2004) (if information is "known to a party or his counsel, such an objection must be made before the jurors are sworn" (quoting *Harris v. State*, 441 S.E.2d 255, 257 (Ga. Ct. App. 1994))).

10

[¶24]  Even if the challenge had not been waived, the district court did not abuse its discretion.  "The test we apply to determine if a prospective juror should be dismissed for cause is whether or not that juror would be able to render a fair and impartial verdict based upon the evidence adduced at trial."  *Castellanos v. State*, 2016 WY 11, ¶ 102, 366 P.3d 1279, 1306 (Wyo. 2016) (citations omitted).  No evidence was presented that Juror E.G. would not be able render a fair and impartial verdict.  The record contains only the trial court's statement that Juror E.G. had a question regarding "medical expense damages."[9]  The differing impressions between defense counsel and plaintiff's counsel after talking to the bailiff are not evidence.  The jury was questioned on the issue of damages during voir dire.  The jury panel had been passed for cause.  Juror E.G. had not asked to speak to the court.  As the district court noted, the jury would be instructed on the law as to the measure of damages.

[¶25]  Finally, Mrs. Lubing cannot show she was prejudiced by the trial court's alleged error, as the jury never reached the issue of damages.  "[A] mere showing of improper communication is not sufficient; prejudice must also be shown."  *Skinner*, ¶ 13, 33 P.3d at 763.  Wyoming Rule of Appellate Procedure 9.04 sets forth the harmless error standard: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded by the reviewing court."  "We conclude . . . the appropriate question under the prejudice prong in a plain error analysis is whether there is a reasonable probability that the result would have been more favorable to the defendant had the error not occurred."  *Larkins v. State*, 2018 WY 122, ¶ 94, 429 P.3d 28, 50 (Wyo. 2018).  *See United States v. Dominguez Benitez*, 542 U.S. 74, 81–82, 124 S.Ct. 2333, 2339, 159 L.Ed.2d 157 (2004) (applying the "reasonable probability" standard to plain error analysis).  "Prejudicial error requires reversal, while harmless error does not."  *Dougherty v. State*, 2016 WY 62, ¶ 22, 373 P.3d 427, 434 (Wyo. 2016) (quoting *Lindstrom v. State*, 2015 WY 28, ¶ 22, 343 P.3d 792, 798 (Wyo. 2015)).  Here, even if the trial court had erred, reversal is not required where the verdict would not have been different.  *Hardman v. State*, 2020 WY 11, ¶ 31, 456 P.3d 1223, 1231 (Wyo. 2020).

## II.  *Did the district court abuse its discretion when it allowed a defense witness to testify to Dr. Tomlinson's character for truthfulness?*

[¶26]  Mrs. Lubing argues the district court erred in allowing Dr. Williams to vouch for Dr. Tomlinson's honesty when Dr. Tomlinson's character for truthfulness had not been attacked during trial.  She claims the exchange was particularly prejudicial because her

---

[9] Mrs. Lubing claims the trial court had a duty to investigate and resolve potential juror bias after it was "apprised of the fact that extrinsic influence may have tainted the trial."  *Sisneros v. City of Laramie*, 773 P.2d 933, 936 (Wyo. 1989).  The line of cases cited by Mrs. Lubing are inapposite because no external influence was present in this case, and there was no indication the juror or the trial was "tainted."

11

case turned on whether the jury believed Dr. Tomlinson's contemporaneous notes stating "relatively negative" aspiration, or whether the jury believed his testimony at trial.

## A.     Standard of Review

[¶27] "The trial court's ruling on the issue of character witnesses [is] a discretionary ruling and will not be disturbed on appeal except for a clear showing of abuse." *Wilhelm v. Lake*, 630 P.2d 499, 502–03 (Wyo. 1981). "If the trial court erred by admitting evidence, we then must ascertain whether the error affects any substantial rights of the accused, providing grounds for reversal, or whether it is harmless." *Skinner*, ¶ 25, 33 P.3d at 766–67 (citation omitted). "An error is deemed prejudicial when there is a reasonable probability that, in the absence of the improper evidence, the verdict would have been more favorable to the appellant." *Gonzalez-Chavarria v. State*, 2019 WY 100, ¶ 20, 449 P.3d 1094, 1098–99 (Wyo. 2019) (quoting *Swett v. State*, 2018 WY 144, ¶ 12, 431 P.3d 1135, 1140 (Wyo. 2018)).

## B.     Analysis

[¶28] "[C]redibility may be supported or attacked by evidence of character for truthfulness or untruthfulness and by specific instances of conduct only as provided in W.R.E. 608." *Barnes v. State*, 858 P.2d 522, 534 (Wyo. 1993). The rule provides in pertinent part:

> **(a) *Opinion and reputation evidence of character.*** — The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible **only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise**.

W.R.E. 608(a) (emphasis added).

[¶29] Dr. Tomlinson claims Dr. Williams's testimony was admissible because Mrs. Lubing attacked his character for truthfulness throughout the trial. She attacked: 1) his testimony that Mrs. Lubing gave an informed consent to the procedure; 2) his testimony that the aspiration was negative before beginning the injection of anesthetic; and 3) his testimony regarding the safety procedures used while preparing for the injection. Dr. Tomlinson concedes that Mrs. Lubing did not use opinion or reputation evidence against him. He maintains Mrs. Lubing "otherwise" attacked his character for truthfulness by means of a continuous assault on his credibility. Mrs. Lubing insists there was no attack

12

on Dr. Tomlinson's character for truthfulness. Rather, her counsel legitimately challenged Dr. Tomlinson's defense.

[¶30] "'Character evidence' is generally defined as '[e]vidence regarding someone's general personality traits or propensities.'" *Martinez v. State*, 2018 WY 147, ¶¶ 35–36, 432 P.3d 493, 502 (Wyo. 2018) (emphasis omitted) (quoting *Gruwell v. State*, 2011 WY 67, ¶ 31, 254 P.3d 223, 233 (Wyo. 2011) (quoting *Character Evidence*, Black's Law Dictionary (8th ed. 2004))). *See Hall v. State*, 2005 WY 35, ¶ 12, 109 P.3d 499, 505 (Wyo. 2005) ("evidence of bias or interest does not constitute an attack on a witness' character for truthfulness"); *Wilhelm*, 630 P.2d at 502 (questions about income tax return and income tax fraud was an attack upon truthfulness and honesty). While Rule 608 allows direct attacks on a witness's veracity in the instant case, the purpose of Rule 608(a)(2) is "to discourage peripheral attacks on a witness's general character for truthfulness." *United States v. Dring*, 930 F.2d 687, 690 (9th Cir. 1991).

[¶31] In some cases, "the category of impeaching evidence employed makes it obvious that character for truthfulness has been attacked." 28 Charles A. Wright & Victor J. Gold, *Federal Practice and Procedure* § 6116, at 71–72 (2d ed. 2012). The Advisory Committee's Note to Rule 608 states: "Opinion or reputation that the witness is untruthful specifically qualifies as an attack, and evidence of misconduct, including conviction of crime, and of corruption also fall within this category." 1 *McCormick on Evidence* § 47, at 370 (Robert P. Mosteller ed., 8th ed. 2020).

[¶32] Here, Dr. Tomlinson argues the attack occurred over the course of the trial, beginning with Mrs. Lubing's opening statement. He charges the opening statement insinuated that he had not procured an informed consent despite anticipated testimony that he obtained one. Dr. Tomlinson claims the attack continued through the direct examination of Dr. Peach and his own cross-examination. In other words, he contends Mrs. Lubing attacked his honest character by raising evidence contradicting his testimony.

[¶33] "Whether evidence in the form of contradiction is an attack upon the character of the witness must depend upon the circumstances." 28 Charles A. Wright & Victor J. Gold, *supra* § 6116, at 74 (quoting Fed. R. Evid. 608, Advisory Committee Note).

> This is because evidence that contradicts the testimony of a witness may be offered to prove various things other than character for truthfulness. For example, evidence that contradicts a witness can be offered to prove his lack of credibility by showing the witness has flawed perceptual, recall, or narrative abilities. Because such evidence suggests the witness has committed only an honest mistake, it does not attack character for truthfulness. Further, contradiction

13

> evidence might be offered to prove the witness has intentionally lied, ***but for reasons that are case-specific*** and have nothing to do with general trustworthiness. Finally, contradiction evidence may be offered not to prove credibility but simply to show that the facts are as described by that evidence.

28 Charles A. Wright & Victor J. Gold, *supra* § 6116, at 74–75 (emphasis added). In contradiction cases, "a useful test employed by the courts is whether the questioning attacks the veracity of the witness's account of the facts in the specific case before the court or attacks the witness's veracity in general." *United States v. Martinez*, 923 F.3d 806, 816 (10th Cir. 2019); *see Renda v. King*, 347 F.3d 550, 554 (3d Cir. 2003) ("Direct attacks on a witness's veracity *in the particular case* do not open the door for evidence of the witness's good character." (emphasis added)).[10] "[M]ost courts do not view contradiction of one witness's testimony by other witnesses as an attack on character." *Martinez*, 923 F.3d at 817 (quoting 4 Jack B. Weinstein & Margaret A Berger, *Weinstein's Federal Evidence* § 608.12[4][a] (Joseph M. McLaughlin ed., 2d ed. 2007)); *see United States v. Drury*, 396 F.3d 1303, 1315 (11th Cir. 2005) ("An attack that consists only of . . . counsel pointing out inconsistencies in testimony and arguing that the accused's testimony is not credible does not constitute an attack on the accused's reputation for truthfulness within the meaning of Rule 608." (internal citation and quotation marks omitted)); 28 Charles A. Wright & Victor J. Gold, *supra* § 6116, at 75 ("[E]vidence of truthful character is admissible to rebut contradiction evidence only where, based on the circumstances, it appears likely the trier of fact will draw from that evidence an inference about untruthful character.").

[¶34] Mrs. Lubing's case was predicated on Dr. Tomlinson's notes. Specifically, she relied on the omissions in the notes and Dr. Tomlinson's statement that the aspiration was "relatively negative." Dr. Tomlinson's defense was that "relatively negative" meant negative and despite their omission from the notes, all appropriate procedures were performed. Credibility was a primary issue in this case.

[¶35] Dr. Tomlinson claims the attack on his character for truthfulness began with Mrs. Lubing's opening statement. *See* 28 Charles A. Wright & Victor J. Gold, *supra* § 6116, at 80 ("The character of a witness also can be attacked in opening statement.") In opening statement, Mrs. Lubing's counsel stated:

---

[10] "When federal rules are virtually identical to their Wyoming counterparts, federal case law interpreting them is persuasive." *Leach v. State*, 2013 WY 139, ¶ 30, 312 P.3d 795, 801 (Wyo. 2013) (citing *Bromley v. State*, 2009 WY 133, ¶ 18, 219 P.3d 110, 115 (Wyo. 2009)).

Before we came to trial we had to do some due diligence. We had to investigate some things. One of the first things we looked at were some of the medical records. And in particular, we looked at the consent forms used by Dr. Tomlinson, informed consent. Dr. Tomlinson typically has a patient sign a form to describe the risks and the dangers of the procedure.

So we had to determine a couple of things. First was if Dr. Tomlinson gave Jill Lubing an informed consent. And then, second, if so, what does that mean? Does that mean that Dr. Tomlinson is not responsible if he needlessly injured Jill Lubing?

On the first issue, what we learned is that there is no informed consent form for the nerve block Dr. Tomlinson performed on March 20th of 2015.

On the second issue you'll hear testimony from Dr. Peach. She obtains informed consent from her patients. And she does so to obtain the right to proceed with the procedure and do it in the safest manner possible. You will hear her acknowledge an informed consent does not absolve her of her duty to the patient to follow the safety protocols.

[¶36] It is undisputed Mrs. Lubing's informed consent for the regional block was not in her medical files. Mrs. Lubing made no claim based on the failure to obtain informed consent and the absence of the consent form was no part of the negligence claim against Dr. Tomlinson. Indeed, the court instructed the jury that the absence of the consent form was not to be considered.

[¶37] Dr. Tomlinson argues the attack in the opening remarks was immediately followed by raising the question of the missing informed consent with Dr. Peach on direct examination. After testifying that she obtains a written informed consent from her patients, Dr. Peach said:

Well, it is the ethical thing to do for one thing. But it is usually . . . mandated by hospital bylaws to get permission from the patient. You can skip getting written informed consent for procedures if it is an emergency, if it is life- or limb-threatening. But usually if there is time enough to talk to the patient about a procedure, the risk, benefits, and

alternatives of that procedure, then you can get written consent and have them sign it.

Expounding on consent, Dr. Peach continued: "I think once you've talked to the patient about risk, benefits, and alternatives [of anesthesia], I think that the patient themselves wouldn't give you permission to do it unless they thought you were going to perform it as safe as possible." Again, we see no attack on Dr. Tomlinson's character. Dr. Peach's testimony only confirmed that an informed consent, normally procured prior to surgery, does not alter the standard of care owed to the patient. *See Renda*, 347 F.3d at 554 ("Direct attacks on a witness's veracity *in the particular case* do not open the door for evidence of the witness's good character." (emphasis added)).

[¶38] Next, Dr. Tomlinson argues that his character for truthfulness was attacked through testimony about whether the aspiration was negative or "relatively negative," and whether he performed certain required safety procedures. He points to Dr. Peach's testimony that he did not meet the standard of care based on the omissions in his notes (for example, omission of the use of a color doppler, application of a variation of probe pressure, or monitoring of the spread of the local anesthetic). *See supra* ¶ 11. The record does not reveal any attacks on Dr. Tomlinson's reputation for truthfulness in the questioning on these matters. It is not disputed these procedures were omitted in Dr. Tomlinson's report, and he wrote "relatively" negative in his notes. The questions posed by counsel fairly addressed the evidence in the light most favorable to Mrs. Lubing.

[¶39] Dr. Tomlinson argues two additional aspects of the trial amount to an attack on character for truthfulness: 1) the impeachment of his testimony on cross-examination regarding his description of the aspiration; and 2) the renewed reference to the absence of a consent form during closing argument. The cross-examination and the closing argument came *after* Dr. Tomlinson invited testimony on his truthful character. We are not persuaded that counsel strayed beyond credibility as it pertains to the specific facts of the case in either situation. *See People v. Serra*, 2015 COA 130, ¶ 66, 361 P.3d 1122, 1135 ("questions during cross-examination that imply a witness's testimony is not credible—such as emphasizing the witness's oath to tell the truth, potential motives to lie or sources of bias, or questioning his or her failure to disclose certain information to the police—are not necessarily attacks on that witness's *character* for truthfulness"). "If the rule were otherwise, evidence of truthful character could be introduced any time a witness was cross-examined about inconsistencies in, or contradiction of, his or her testimony, or any time the witness was questioned about facts that indicated that his or her testimony might not be credible." *Id.* ¶ 67, 361 P.3d at 1135.

[¶40] "Credibility of witnesses is always a question of fact for the trier of fact to determine." *Barnes*, 858 P.2d at 534. In this case, the district court erred in admitting Dr. Williams's testimony regarding Dr. Tomlinson's honesty in the absence of an attack on his character for truthfulness.

16

[¶41] We must now determine whether the admission of testimony vouching for Dr. Tomlinson's truthful character affected Mrs. Lubing's substantial rights. W.R.A.P. 9.04. "An error is prejudicial if there is a reasonable probability that the verdict would have been more favorable to the appellant had the error not occurred." *Swett*, ¶ 42, 431 P.3d at 1146 (citations omitted). Mrs. Lubing contends the admission of Dr. Williams's testimony at the urging of the district court was "sufficiently prejudicial on a key issue to warrant reversal." We disagree.

[¶42] Mrs. Lubing argues the ultimate question was whether the jury believed the language in Dr. Tomlinson's notes or his testimony. Therefore, she concludes Dr. Williams's testimony, that he had "never found [Dr. Tomlinson] to be anything but truthful," was the fulcrum of the jury's verdict. Dr. Williams's opinion on Dr. Tomlinson's credibility, however, was but a momentary detour in an eight-day trial that included extensive expert testimony regarding the standard of care.

[¶43] In addition to the disputed aspiration results, Dr. Peach's expert opinion alleged a series of violations based, for the most part, on omissions in Dr. Tomlinson's notes. The jury then heard contrary evidence including that, despite the lack of documentation, Mrs. Lubing was continuously monitored, and Dr. Tomlinson used ultrasound, color doppler, and the other protocols.

[¶44] The jury also heard Dr. Tomlinson agree that he did not perform protocols which Dr. Peach alleged were required under the standard of care. For example, Dr. Tomlinson agreed he did not use epinephrine in the anesthetic mix. Dr. Tomlinson's expert, Dr. Joseph Neal, testified the decision not to include epinephrine in the anesthetic mix was not a violation of the standard of care. Dr. Neal testified, "[T]he epinephrine is a great example of where very reasonable scientifically based physicians pretty much vehemently disagree on the value of epinephrine as a test dose." Similarly, Dr. Tomlinson admitted he did not use a sedative as Dr. Peach would require. Dr. Neal opined the use of a sedative (such as Versed or Midazolam) was not necessary, and Mrs. Lubing received sufficient sedation while in the emergency room. Dr. Neal also testified, disagreeing with Dr. Peach, that Dr. Tomlinson's decision to rely on a nasal cannula rather than an oxygen mask was reasonable and did not violate the standard of care. Dr. Tomlinson testified he did not use a continuous aspiration technique, rather he aspirated immediately before each injection. Dr. Neal agreed that "aspiration just prior to injection is critical." He testified again, contrary to Dr. Peach, that continuous aspiration during the procedure is not necessary to meet the standard of care. Dr. Neal also pointed out "aspiration is not a hundred percent. We know that there is probably at least a 2 percent false negative rate, which means that even when you're in the vessel and you aspirate, nothing's coming back."

[¶45]   Dr. Williams's testimony was a small part of the abundant evidence from which the jury could independently determine Dr. Tomlinson's credibility as well as the credibility of the other witnesses.  A careful review of the record confirms that the erroneous admission of Dr. Williams's character testimony would not have changed the outcome of the trial.

## *CONCLUSION*

[¶46]   Mrs. Lubing waived her challenge to the participation of Juror E.G.  Even if there was no waiver, the district court did not abuse its discretion in denying further investigation into Juror E.G.'s communication with the court bailiff.  Mrs. Lubing did not attack Dr. Tomlinson's character for truthfulness at trial.  Therefore, the district court erred in admitting Dr. Williams's testimony vouching for his honest character.  This error, however, did not prejudice Mrs. Lubing.  Affirmed.[11]

---

[11] Mrs. Lubing filed a separate appeal contesting the taxation of costs. *Lubing v. Tomlinson*, S-19-0068. We consolidated the cases for appeal.  In Mrs. Lubing's appellate brief, she notified this Court that she "has chosen not to appeal the district court's March 19, 2019 decision" regarding the taxation of costs "on independent grounds."  We will, therefore, not consider the issues abandoned by Mrs. Lubing on appeal.